**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANTHONY K. HART,
            *Plaintiff-Appellant,*

v.

BERNARD PARKS, Chief of Police;
MARC ZAVALA; ROBERT RIVERA;
DARYL MCLEMORE,
            *Defendants-Appellees.*

No. 04-55553

D.C. No.
CV-02-01332-GHK

ANTHONY K. HART,
            *Plaintiff-Appellant,*

v.

BERNARD PARKS, Chief of Police;
DAVID KALISH; MARC ZAVALA;
ROBERT RIVERA; MANNY AVILA;
RON SANCHEZ; ROBERT REHME;
ACADEMY OF MOTION PICTURE
ARTS AND SCIENCES; JAMES D.
STALEY; BRUCE E. DAVIS,
            *Defendants-Appellees.*

No. 04-55555

D.C. No.
CV-00-03675-GHK

OPINION

Appeal from the United States District Court
for the Central District of California
George H. King, District Judge, Presiding

Argued and Submitted
April 5, 2006—Pasadena, California

Filed June 19, 2006

6771

Before: Dorothy W. Nelson and Diarmuid F. O'Scannlain, Circuit Judges, and Robert C. Jones,* District Judge.

Opinion by Judge O'Scannlain

---

*The Honorable Robert C. Jones, District Judge for the District of Nevada, sitting by designation.

---

**COUNSEL**

Stephen Yagman, Yagman & Yagman & Reichman, Venice Beach, California, argued the cause for the appellant. Marion R. Yagman and Joseph Reichmann, Yagman & Yagman & Reichman, Venice Beach, California, were on the brief.

Bloth S. Back, Deputy City Attorney, Los Angeles, California, argued the cause for the appellees. Rockard J. Delgadillo, City Attorney, and Janet Bogigian, Assistant City Attorney, Los Angeles, California, were on the brief.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We consider whether Los Angeles police officers violated an individual's constitutional rights by arresting him for his suspected role in the theft of Oscar statuettes to be presented by the Academy of Motion Picture Arts and Sciences on Academy Awards night in March 2000.

I

Anthony Hart alleges various constitutional injuries arising from two arrests—in March 2000 and again in August 2000—for his suspected role in the theft of the Academy of Motion Picture Arts and Sciences' Oscar statuettes.[1] Because the

---

[1]Hart's Opening Briefs in each of these two appeals include more than 25 pages of "facts," which unfortunately include speculation, innuendo,

claims are numerous and the issues presented are even more numerous, the facts are set out in some detail.

A

1

On March 13, 2000, the Executive Director of the Academy of Motion Picture Arts and Sciences suspected that the Oscar statuettes, which had recently been shipped from the manufacturer in Chicago, were missing and possibly stolen. Roadway Express Shipping ("Roadway") had been hired to deliver the trophies. The Academy contacted the Los Angeles Police Department ("LAPD"), which assigned detectives Marc Zavala and Robert Rivera, members of its Burglary Auto Theft Division, to investigate. Zavala had investigated cargo thefts for 10 years and Rivera had investigated cargo thefts for three years.

Zavala and Rivera began their investigation by interviewing Jon Gerloff, Roadway's security chief. Gerloff told the detectives that the Oscars had been "scanned off" at the Los Angeles Roadway facility—meaning that they had arrived in Los Angeles—but had not arrived at the Academy in Hollywood, the proper delivery address. After "exhaust[ing] every route and or scenario as to where the Oscars may have been (mistakenly) shipped," the detectives and Gerloff concluded that the Oscars had been stolen from the Los Angeles Roadway facility on March 8, at some time between 3:01 am and 8:00 am.

and argument mixed with actual facts. We remind counsel that the "fact" section of a brief is for facts; argument should be reserved for the argument section of the brief. *Compare* Fed. R. App. Pro. 28(a)(7) (statement of facts) *with* Fed. R. App. Pro. 28(a)(9) (argument). The Federal Rules of Appellate Procedure's requirement of separate sections for facts and argument is mandatory, not suggestive.

Zavala and Rivera began interviewing potential witnesses. Rivera spoke with one employee who identified Anthony Hart as a "known thief" who had approached him hoping to steal Macy's merchandise shipped via Roadway. Zavala subsequently confirmed that a Macy's trailer had been recently stolen from the Roadway facility. Zavala spoke with a second man who stated that Hart was involved in the theft. When Zavala interviewed Hart, Hart only disclosed that he was a forklift driver for Roadway and gave his home address in La Puente. Hart refused to discuss the Oscar theft, explaining that he was "not a snitch."

After further discussions with Roadway employees, Zavala and Rivera concluded, in part on the basis of their combined experience investigating cargo theft, that the 500 pound wooden pallet containing the Oscars had likely been taken off the dock with a forklift. The detectives further concluded that the heist likely required at least two parties: a truck driver and a forklift operator.

The next day, Zavala and Rivera privately announced a $25,000 reward for information about the theft of the Oscar statuettes. The detectives disclosed the award only to Roadway dockworkers, and detective Rivera saw Hart in the crowd. The award announcement generated two significant leads. First, Gerloff informed Zavala and Rivera that Roadway received an anonymous call stating that Hart was involved in the theft of the statuettes. Second, a Daniel Pearson called Roadway and left a message about the reward. Pearson stated that "an individual who wanted to turn in the Oscars and collect the twenty-five thousand-dollar reward had 'retained' him." When Pearson phoned Roadway, the award had not been made public. Suspecting his possible involvement in the theft or his association with those involved in the theft, LAPD officers conducted a surveillance of Pearson. Officers saw Pearson drive from his law offices to Hart's residence in La Puente.

On March 17, Zavala and Rivera met again with the Roadway dockworkers—including Hart—and informed them that the reward had increased to $50,000. As happened after announcing the first award, Gerloff reported receiving another anonymous phone call—from a different source—who also stated that Hart was involved in the Oscar theft. Similarly, within 30 minutes of offering the increased reward, Pearson again called Zavala seeking the $50,000 reward. According to Zavala,

> Pearson called me and told me that "they" have the stuff. Pearson wanted my assurance that nothing is going to happen to "them" and that "they" would in fact get paid the reward money. Pearson also told me he heard from his client the reward money was now fifty thousand dollars and they expected to be paid that amount.

Pearson requested that a copy of the reward information be faxed to his office and stated that in exchange he would deliver the Oscars to an undisclosed location. As with the $25,000 offer, only Roadway employees knew of the $50,000 reward.

Based on the timing of Pearson's phone calls, the detectives inferred that Pearson was in contact with a Roadway employee. Because Pearson had recently driven to Hart's home, the detectives concluded that Pearson and Hart knew each other and that Hart had called Pearson about the $50,000 reward after the detectives announced it.

In addition to the two phone calls Gerloff received, Zavala also received an anonymous phone call on March 18. The anonymous caller told Zavala that he had been working at Roadway on March 8; that he had personally seen Hart steal the pallet containing the Oscar statuettes; and that Hart had placed the pallet inside a trailer driven by a "Lawrence /

Larry." The caller told Zavala that Hart and Larry had worked together on the theft.

Zavala and Rivera attempted to corroborate the information in the anonymous tip. They examined Roadway's timesheets and confirmed that both Hart and a truck driver named "Larry" Ledent were working on the morning of the theft. Further, the heist as described fit with the detectives' theory that any theft would require at least two participants: a forklift operator and a truck driver. Based on the detectives' experience, they believed that a Teamster would not "rat" on a fellow employee. Therefore, the detectives surmised that the tipster remained anonymous because he was a Teamster, and therefore likely a Roadway employee.[2]

On March 18, Zavala also learned that both Ledent and Hart had prior arrests and convictions for theft. Later the same day, Zavala and Rivera went to Hart's residence in La Puente and questioned him outside his home. Zavala requested Hart's consent to search his home for the statuettes, but Hart refused. The detectives then informed Hart that he would be taken to LAPD headquarters for questioning. Before they departed the scene, Aubrey Hart, Anthony Hart's brother, arrived. After discovering that Aubrey had an outstanding narcotics warrant, the police arrested him and transported him—along with his brother Anthony—to police headquarters for further questioning.

---

[2]Hart contends that because the LAPD also has a "code of silence," it was improper for the detectives to consider the Teamsters' purported "code of silence." Thus, Hart requests that we take judicial notice, pursuant to Federal Rule of Evidence 201, of the Christopher Commission Report for the proposition that the "Code of Silence is alive and well within the LAPD." Br. of Appellant (*Hart I*) at 10 n.2 (citing *Cunningham v. Gates*, 229 F.3d 1271, 1284 n.19 (9th Cir. 2000)). The propriety of considering whether the Teamster's employ a "code of silence," however, is completely unrelated to any code of silence adopted by the LAPD. Hart's request for judicial notice is denied.

After Zavala and Rivera detained Anthony Hart, they discovered that Hart's sister was the wife of Daniel Pearson. (Hart and Pearson, therefore, were brothers-in-law.[3]) Also on March 18, but after Hart's arrest, two detectives went to Larry Ledent's home. Ledent was taken to police headquarters for questioning, and he confessed that he and Hart had stolen the Oscars. According to Ledent, on March 8, 2000, Hart placed the Oscars into Ledent's trailer and said " 'I got something in there for you.' " Ledent and Hart had apparently stolen other merchandise in the same manner on three occasions in the prior two months.

2

On March 20, 2000, the LAPD, Roadway, the Academy, and the City of Bell Police conducted a joint press conference to announce the recovery of the Oscars. Hart's name was mentioned only once during the press conference when then-LAPD Chief Bernard Parks stated that "two suspects have been arrested . . . for grand theft . . . . [We] arrested Mr. Anthony Keith Hart and Lawrence Edward Ladent [sic], both employees of Roadway Express."

On March 24, 2000, Roadway fired Hart for violating Roadway's policy against "dishonesty" by participating in the Oscar theft. Roadway's termination letter did not refer to or otherwise mention the press conference.

3

On March 21, 2000, three days after Hart's arrest, the

---

[3]At the time of Hart's arrest, police were only aware that Pearson and Hart were acquainted, based on the fact that Pearson drove to Hart's house. Of course, "[f]acts uncovered after the arrest are irrelevant" to determining whether there was probable cause to arrest in the first place. *United States v. Collins*, 427 F.3d 688, 691 (9th Cir. 2005) (citing *Allen v. City of Portland*, 73 F.3d 232, 236 (9th Cir. 1996)).

detectives presented their arrest and investigation reports to the district attorney. The district attorney's office, however, concluded that there was insufficient evidence at that point to prosecute Hart who was thereupon released from custody.

B

Over the next five months, Zavala and Rivera continued to investigate and discovered additional evidence incriminating Hart. This evidence included: (1) telephone records reflecting phone calls between Hart and Ledent at the time of the theft and retrieval of the Oscars; (2) the statement of Ron Sandoval, another Roadway employee, that Hart had called Pearson and Ledent from Sandoval's home on March 17; (3) a statement from Larry Ledent that Hart had two of the missing Oscars; (4) a statement by Steve Jordan that he delivered one or two Oscars to Hart at Ledent's request; (5) a time-stamped Roadway security tape showing Hart on the loading dock near Ledent's trailer, where the Oscars were last seen; (6) Roadway records reflecting that there was no reason Hart should have been near Ledent's trailer; (7) confessions by Larry Ledent and John Harris admitting they stole the Oscars with Hart and stored them in Harris's home.

On August 4, 2000, the district attorney impaneled a grand jury. Detectives Zavala and Rivera, Roadway security chief Gerloff, and attorney Daniel Pearson testified and the grand jury indicted Hart on August 8. Hart was re-arrested on the warrant on August 14 and on August 15, pled not guilty to a single charge of grand theft.

On February 9, 2001, the district attorney added a charge of receiving stolen property to which Hart also pled not guilty. The charge of grand theft was subsequently dropped, and on October 23, 2001, Hart changed his plea to *nolo contendre* on the charge of receiving stolen property and received a sentence of three years probation.

C

Hart subsequently brought these suits against 14 defendants
—primarily Los Angeles police officers, but also individuals
from the Academy and Roadway—in the district court, under
42 U.S.C. § 1983, alleging a variety of injuries stemming
from his allegedly unconstitutional arrests. In *Hart v. Parks*,
(docket number 04-55555) ("*Hart I*"), Hart alleged that his
March 2000 arrest was unconstitutional; in *Hart v. Parks*
(docket number 04-55553) ("*Hart II*"), Hart alleged that his
August 2000 arrest was unconstitutional. After various
motions to dismiss and for summary judgment, the district
court dismissed suit against all defendants except Parks,
David Kalish (then-Deputy LAPD Chief), Zavala, and Rivera
(collectively, "police officers"). The district court subse-
quently granted summary judgment for the police officers in
both *Hart I* and *Hart II*. Hart's appeals from the district
court's orders have been consolidated here.[4]

II

Hart argues that his March 2000 arrest was unconstitutional

---

[4]We review a grant of summary judgment de novo. *Sagana v. Tenorio*,
384 F.3d 731, 736 (9th Cir. 2004). Summary judgment is proper "if the
pleadings, depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no genuine issue as
to any material fact and that the moving party is entitled to a judgment as
a matter of law." Fed. R. Civ. P. 56(c). All reasonable inferences are
drawn in Hart's favor, and the police officers—as the moving party—bear
the burden of production and persuasion. *Anderson v. Liberty Lobby*, 477
U.S. 242, 255 (1986). The police officers moved for summary judgment,
so they have the burden of establishing that there is no genuine issue of
material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). How-
ever, because Hart bears the burden of proof at trial, the police officers
may meet the summary judgment standard by pointing to the absence of
evidence to support Hart's case. *Id.* at 325; Fed. R. Civ. P. 56(e).

for two reasons: first, that he was arrested in his home without a warrant; second, that he was arrested without probable cause.[5]

A

[1]  *Payton v. New York*, 445 U.S. 573, 588-89 (1980), prohibits the warrantless arrest of a suspect inside his residence. Although Hart was arrested *outside* his home, he rightly notes that we have recognized constructive *Payton* violations. *See United States v. Al-Azzawy*, 784 F.2d 890, 893-95 (9th Cir. 1985). In *Al-Azzawy*, we held that the *Payton* warrant rule applied when police officers surrounded the suspect's trailer, drew their weapons, and directed him (with a bullhorn) to exit the residence. *Id.* at 893. The suspect only left his residence "under circumstances of extreme coercion." *Id.*

[2] Here, Hart has proffered no admissible evidence that he was coerced into leaving his house.[6] The only valid evidence in the record is the detectives' declarations, which state that they requested that Hart speak with them outside. All admissible evidence shows that Hart was asked to leave his house and did so free from coercion, let alone free from "circumstances of extreme coercion" commensurate with those presented in *Al-Azzawy*. *Id.* at 983. There is no triable issue of fact as to whether the warrantless arrest occurred inside the home.

---

[5]*Heck v. Humprey*, 512 U.S. 477 (1994), generally bars a claim for false arrest under § 1983 if success in the false arrest suit would be inconsistent with an underlying conviction. Here, however, police arrested Hart twice. Because Hart may have been improperly arrested in March, but properly arrested (and convicted) in August, *Heck* does not bar suit as to the March arrest.

[6]Hart has submitted a "declaration" telling a somewhat contrary story. However, the district court concluded that Hart's "declaration," being unsigned and unsworn, is not valid evidence. Hart does not challenge this conclusion on appeal; therefore, no valid contradictory evidence exists.

## B

Hart next contends that police lacked probable cause to arrest him in March 2000.

### 1

**[3]** Probable cause exists when " 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.' " *Bailey v. Newland*, 263 F.3d 1022, 1031 (9th Cir. 2001) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Police must only show that, " 'under the totality of the circumstances,' " " 'a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime.' " *United States v. Valencia-Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002) (quoting *United States v. Garza*, 980 F.2d 546, 550 (9th Cir. 1992)).

### 2

**[4]** Detectives Zavala and Rivera had substantial evidence tending to show that Hart had a role in the theft of the statuettes. The police learned that Hart was working during the period in which the Oscars were stolen, that he drove a forklift, and that Hart was working at the same time as Ledent (a truck driver)—meaning that Hart was capable of, and had ample opportunity to, commit the theft. Because the detectives were investigating a possible theft, it is particularly relevant that both Hart and Ledent had prior convictions for theft. *Greenstreet v. County of San Bernardino*, 41 F.3d 1306, 1309 (9th Cir. 1994) (citation omitted) (Prior convictions may also support probable cause, "especially where the previous arrest or conviction involves a crime of the same general nature as the one the warrant is seeking to uncover."); *United States v. $22,474.00 in United States Currency*, 246 F.3d 1212, 1217

(9th Cir. 2001) (same). Further, and perhaps most relevant, the police knew that Hart associated with Pearson, who had called them, claiming to know the location of the stolen property. The police could reasonably assume that only someone involved in the theft would know the location of the Oscars, meaning that Hart was very likely involved in the theft. On top of all this, Roadway's security director received two anonymous tips implicating Hart, and the police received a third tip implicating Hart and Ledent, all of which were valuable even if not corroborated. *United States v. Roberts*, 747 F.2d 537, 544 (9th Cir. 1984).

**[5]** Considering this evidence "under the totality of the circumstances . . . a prudent person would have concluded that there was a fair probability that [Hart] had committed a crime." *Valencia-Amezcua*, 278 F.3d at 906 (citation and quotation omitted). The police had probable cause to arrest Hart in March 2000.

3

**[6]** Hart, however, argues that despite this overwhelming evidence, there remains a triable issue of fact as to whether the officers had probable cause to arrest him. Hart's main contention is that Zavala and Rivera relied upon hearsay and other unsubstantiated information in determining they had probable cause. *See*, *e.g.*, Br. of Appellant (*Hart I*) at 9, 10, 19, 20, 23, 26, 27, 28.[7] This argument is meritless: Police may rely on hearsay and other evidence that would not be admissible in a court to determine probable cause: "[P]robable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily." *Franks v. Delaware*, 438 U.S. 154, 165 (1978); *see also*

---

[7]There may be additional examples of this fallacious argument, but because Hart intersperses his argument with his fact section, we find it difficult to isolate distinct arguments.

*Spinelli v. United States*, 393 U.S. 410, 419 (1969) ("[A]ffidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial." (internal citation omitted)).

**[7]** Similarly, we reject Hart's related contention that the district court improperly considered the detectives' declarations because they are not valid evidence under Federal Rule of Civil Procedure 56(e) which requires that "affidavits submitted on summary judgment must be made on personal knowledge." Br. of Appellant (*Hart II*) at 9. Keeping in mind that the issue was whether the police had probable cause to arrest, while the detectives did not have "personal knowledge" of whether the Oscars were *actually* stolen, they did have personal knowledge of the information they had received at the time of Hart's arrest. The detectives' declarations, therefore, are a perfectly proper basis for summary judgment determination of probable cause.

4

Similarly, Hart questions whether the police officers presented valid evidence that the statuettes were ever actually stolen. Again, this is immaterial. It is irrelevant whether the police had admissible evidence proving beyond a reasonable doubt that the Oscars were stolen at the time they arrested Hart. Hart's central allegation is that the police lacked probable cause to arrest him. Here, a prudent person could conclude that a pallet of merchandise that disappeared, under the circumstances presented here, had been stolen. Of course, it was impossible to *definitively* conclude that the missing pallet had been stolen until it had been found; yet that does not mean that police lack probable cause to arrest until they have confirmed a theft beyond a reasonable doubt.

5

Hart's next contention is that the police did not have probable cause to arrest him because the facts gave rise to a variety

of "inferences," some of which supported Hart's innocence. *See*, *e.g.*, Br. of Appellant (*Hart I*) at 10, 17, 24. Of course, facts may always give rise to a variety of inferences. Yet, it is settled law that officers may " 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.' " *United States v. Hernandez*, 313 F.3d 1206, 1210 (9th Cir. 2002) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). The fact that other inferences are possible does not mean that there is a triable issue of fact as to whether there was probable cause.

6

**[8]** Similarly, we reject Hart's contention that there was no probable cause because each fact—if viewed in isolation—was independently insufficient. For example, Hart notes that the police learned that he had loaded a pallet into Ledent's truck, but that, "[a]t worst, this is evidence that Hart loaded a shipment onto the wrong truck, or, in other words, made a mistake." We reject Hart's attempt to atomize the probable cause inquiry by examining pieces of evidence independent of one another. Officers draw their inferences based on "cumulative information." *Hernandez*, 313 F.3d at 1210. While Hart's behavior may appear innocent when stripped of context, it does not appear so when viewed in light of the aggregate evidence. Moreover, even if it were proper to view pieces of evidence independently rather than cumulatively, officers may "perceive meaning from conduct which would otherwise seem innocent to the untrained observer." *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) (internal citations omitted).

7

**[9]** Hart next contends that the detectives' declarations inconsistently describe the number of phone calls received,

giving rise to an inference that the police fabricated the calls. Specifically, in Zavala's declaration he states that, "[o]n 3/15/2000, Jon Gerloff stated to myself and Rivera that an anonymous caller told him 'Anthony Hart' was involved in the theft of the Oscars. Roadway Express had received information, from two different people, that Anthony Hart had taken the statuettes." On this basis, Hart argues that Zavala's declaration indicates that Roadway received three phone calls rather than two. We reject Hart's contention that the Zavala's declaration presents an inconsistency giving rise to a triable issue of fact as to whether the police fabricated the phone logs. Zavala's declaration states that Gerloff spoke with "*an* anonymous caller"—indicating a *single* caller—on March 15. The declaration then states that Roadway received information from "two different people," which is also true: Gerloff received one call on March 15 and another on March 17. While Zavala's declaration could have been clearer—by stating that Roadway had only received one phone call on March 15, although it received a total of two phone calls during the course of the investigation—there is not necessarily any inconsistency here. Indeed, as the district court noted, the arrest report, Gerloff's deposition, the detectives' earlier depositions, and the detectives' later depositions *all* stated that Roadway received only two calls. The district court rightly concluded that Zavala's single arguably ambiguous statement does not raise a genuine issue of material fact as to whether the police manufactured the phone calls.

8

Finally, Hart contends that summary judgment was inappropriate because of various factual inconsistencies. However, on review of the record, we agree with the district court that these so-called "facts" are little more than Hart's own distortions of the record. First, in his *fact* section, Hart quotes the officers as stating that Hart "refused to cooperate and we [retaliated and] arrested him for Grand Theft." Br. of Appellant (*Hart I*) at 22 (brackets in Hart's brief). The declaration

which Hart "quotes" actually reads as follows: "On March 18, 2000 we went to Hart's house . . . . While at Hart's house, we asked Hart to come outside. He did. We told him we wanted to talk to him and search his house for the missing statuettes. He refused to cooperate and we arrested him for Grand Theft." Hart's colorful addition of "[retaliated and]" is inaccurate and misleading. Further, Hart's later repeated assertions that the officers "*admit* they retaliated against Mr. Hart in arresting him," Br. for Appellant (*Hart I*) at 47 (emphasis added), are equally disingenuous. Even the most innocuous quotation, when disfigured through the liberal use of brackets, can appear invidious; that does not mean, however, that a genuine issue of material fact is presented. We remind counsel (again), that the "fact" section of a brief is for facts; it is not an opportunity to engage in imaginative additions with wanton disregard for the record.

9

**[10]** Hart also states that the officers refer to him as a "brother[ ]" in the arrest report, possibly revealing a racist motivation for the arrest. Br. for Appellant (*Hart I*) at 47 (brackets in Hart's brief). Our review of the record, however, shows Hart's claim to be without merit. When police arrested Anthony Hart, the plaintiff, they also arrested his brother, Aubrey Hart. The two Harts are male siblings, or "brothers." *See Webster's Third New International Dictionary* 284 (1986) (defining "brother" as "a male human being considered in his relation to another person having the same parents"). Thus, the arrest report states that the police "transported the two brothers to the City of Industry station." Though there may be offensive connotations to this term in some contexts, here, the term "brother" is not used disparagingly, but rather describes Anthony and Aubrey Hart to be the relatives that they are. Without more evidence of racial animus, we conclude that the district court did not err in granting summary judgment to the defendants on that issue.

10

**[11]** Hart also contends that the police "retaliated" against his brother, Aubrey, by illegally running a warrant check on him, and then arresting him. The police report, however, states that Aubrey Hart arrived at Hart's house and declined to talk to police.[8] Police then ran a warrant check on Aubrey Hart and discovered an outstanding warrant. The police report states that when Aubrey Hart left his brother's house "to antagonize [the police], [the police] placed him under arrest." Hart cites to two cases for the proposition that it was illegal for police to run a warrant check against Aubrey Hart: *United States v. Luckett*, 484 F.2d 89, 90-91 (9th Cir. 1973) (per curiam) and *United States v. Prim*, 698 F.2d 972, 975 (9th Cir. 1983). *Lucket* and *Prim* held that police could not justify an illegal detention based on a warrant found *after* the detention. Here, the police discovered an outstanding warrant *before* arresting Aubrey Hart, and therefore did not violate *Luckett* and *Prim*. Again, this perfectly legal arrest does not give rise to a triable issue of fact as to whether the police wrongly arrested Anthony Hart.

11

**[12]** In sum, there is no genuine issue as to a material fact here, and the district court properly granted summary judgment for the police officers as to the probable cause issue.

C

**[13]** Because police had probable cause to arrest him, Hart's false arrest claim necessarily fails. *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (per curiam) ("To prevail on his section 1983 claim for false arrest

---

[8]To be completely accurate, lest we be accused of the same distortions perpetrated in Hart's briefs, Aubrey Hart informed the officers, "I don't have to say shit to you."

. . . [the plaintiff] would have to demonstrate that there was no probable cause to arrest him.").

D

**[14]** Similarly, because the detectives had probable cause to arrest Hart and there is no evidence that the detectives intended to violate his constitutional rights, Hart's conspiracy claims also fails. *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) ("To prove a conspiracy . . . under § 1983, [plaintiff] must show 'an agreement or "meeting of the minds" to violate constitutional rights.' " (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989) (en banc)).

E

**[15]** Hart next asserts that the police officers made defamatory statements about him at a March 20, 2000, press conference. Damage to reputation alone is not actionable under § 1983, *Paul v. Davis*, 424 U.S. 693, 711-12 (1976), although a § 1983 claim may lie if Hart was stigmatized in connection with the denial of a "more tangible" interest. *Id.* at 701-02; *see also Cooper v. Dupnick*, 924 F.2d 1520, 1532 (9th Cir. 1991). This is known as the "stigma-plus" test, and can be satisfied in two ways.

First, the plaintiff must show that the injury to his reputation was inflicted *in connection with* the deprivation of a federally protected right. *See*, *e.g.*, *Gobel v. Maricopa County*, 867 F.2d 1201, 1205 (9th Cir. 1989). Because police had probable cause to arrest him, Hart cannot show an injury to his reputation in connection with the deprivation of a federally protected right.

**[16]** Second, the plaintiff must show that the injury to reputation *caused* the denial of a federally protected right: "The procedural protections of due process apply if the accuracy of

the charge is contested, there is some public disclosure of the charge, and it is made in connection with the termination of employment . . . ." *Vanelli v. Reynolds School Dist.*, 667 F.2d 773, 777-78 (9th Cir. 1982). Here, even assuming that the accuracy of the charge is contested, *and* assuming that the statements were defamatory (which they were not, as the police had a basis to make them), Hart has not proffered any evidence that he lost his job *because of* the defamatory statements. It appears quite clearly from Roadway's termination letter to Hart, that he was fired for stealing the Oscar statuettes, not because of Parks's remarks.

F

**[17]** Having concluded that Zavala and Rivera committed no constitutional violations with respect to the March 2000 arrest, we need not consider whether qualified immunity applies. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

III

Hart further argues that his August 2000 arrest was unconstitutional and that the district court's grant of summary judgment for the police officers was in error.[9] Following his release in March, the police collected additional evidence and arrested Hart again in August 2000. Hart contends that his second arrest and subsequent prosecution violated his Fourth and Fourteenth Amendment rights and seeks redress under § 1983 for malicious prosecution.

A

Hart first argues that his August 2000 arrest was without probable cause.

---

[9]The summary judgment framework is identical to that presented above. *See* Fed. R. Civ. P. 56(c).

1

**[18]** The district court properly concluded that probable cause for an arrest "may be satisfied by an indictment returned by a grand jury." *Kalina v. Fletcher*, 522 U.S. 118, 129 (1997) (citing *Gerstein v. Pugh*, 420 U.S. 103, 117 (1975) and *Coolidge v. New Hampshire*, 403 U.S. 443 (1971)). Normally, this alone would extinguish the inquiry into the false arrest claim, but here Hart also questions the validity of the indictment.

Hart suggests that the indictment was invalid because the police presented false and misleading testimony. But the so-called false evidence to which Hart points is the same evidence that has been discussed and explained above. Hart accuses the police of lying to or deceiving the grand jury because they did not disclose that they arrested Hart because of his race. As explained above, referring to the Harts as brothers raises no racial connotations on the facts of this case.

2

**[19]** Further, even if the indictment were not valid, the police had probable cause to make the August 2000 arrest. We have already concluded that the police officers had probable cause to arrest Hart in March 2000. When the police arrested Hart again in August 2000, they had adduced even more evidence tending to prove his guilt, including a variety of confessions from others involved in the Oscar theft which implicated Hart. If police had probable cause to arrest Hart in March, then *a fortiori* they had probable cause to arrest him in August with the substantial additional evidence.[10]

---

[10]Hart argues that at least one of these confessions, that of Larry Ledent, was coerced. However, Hart does not submit evidence showing this to be true. Further, even ignoring Ledent's confession, police had substantial evidence in August 2000 upon which to base an arrest.

**[20]** Therefore, the district court properly granted the police officers' motion for summary judgment on the false arrest claim.

B

**[21]** Next, Hart contends that he suffered malicious prosecution.[11] A malicious prosecution claim requires, *inter alia*, a lack of probable cause. *Usher v. City of Los Angeles*, 828 F.2d 556, 562 (9th Cir. 1987). Because the police had probable cause to arrest Hart, his malicious prosecution claim fails.

C

Hart also alleges municipal liability for violations of his constitutional rights.[12] *See Monell v. Dep't of Soc. Services*, 436 U.S. 658 (1978). Under *Monell*, a municipality may be held liable under § 1983 only for constitutional violations occurring pursuant to an official government policy or custom. *See id.* at 691; *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). Because the police had probable cause to arrest him in August 2000 and because Hart did not provide any evidence showing that the LAPD has a policy or custom allowing unconstitutional arrests, the district court properly

---

[11]Subsequent to our oral argument, the government submitted a letter citing to supplemental authorities, pursuant to Federal Rule of Appellate Procedure 28(j). In response, counsel for Hart filed a similar letter, again pursuant to Rule 28(j). The Rule, however, limits any such letter to 350 words ("The body of the letter must not exceed 350 words. Any response must be made promptly and must be similarly limited."). Though the government's Rule 28(j) letter properly conforms to the rule, numbering approximately 100 words, Hart's Rule 28(j) letter exceeds the proscribed limit by over 500 words. Consequently, Hart's letter will not be considered.

[12]Although Hart does not name a municipality as a defendant, it is sufficient to bring suit against the police officers in their official capacities. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n.55 (1978) ("Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent.").

dismissed this claim. *Monell*, 436 U.S. at 694; *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

## D

**[22]** Last, Hart claims that the police officers conspired to violate his constitutional rights. As noted above, however, Hart has not shown any "actual deprivation of his constitutional rights resulted from the alleged conspiracy." *Woodrum v. Woodward County*, 866 F.2d 1121, 1126 (9th Cir. 1989) (citations omitted). The district court properly granted summary judgment on Hart's conspiracy claim as well.

## IV

For the foregoing reasons, the district court judgments are AFFIRMED.