**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee*,

v.

JOHNNY CASEL NORA, AKA John
Carter, AKA John Nora, AKA
Johnny Nora, AKA Johnny Carl
Nora,
  *Defendant-Appellant*.

No. 12-50485

D.C. No.
2:09-cr-00092-
SVW-1

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
January 8, 2014—Pasadena, California

Filed August 28, 2014

Before: William A. Fletcher, Milan D. Smith, Jr.,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Watford

## SUMMARY[*]

### Criminal Law

The panel reversed the district court's denial of a motion to suppress evidence seized from the defendant's home, and remanded for further proceedings, in a case in which the defendant entered a conditional guilty plea to possession of cocaine base with intent to distribute.

The panel held that although the defendant's arrest was supported by probable cause, the arrest violated *Payton v. New York*, 445 U.S. 573 (1980), and violated the Fourth Amendment, where the officers physically took the defendant into custody outside his home in the front yard only by surrounding his house and ordering him to come out at gunpoint, and no exigency existed.

The panel held that evidence seized during a pat-down search incident to an arrest made in violation of *Payton* must be suppressed, whether the search occurs inside the home or, as in the case of the cash and marijuana here, outside the home. The panel held that the defendant's post-arrest statements are subject to suppression as well, as fruit of the unlawful search of his person. The panel held that suppression of this evidence renders the portions of the warrant authorizing a search for narcotics-related evidence and evidence of gang membership invalid. The panel held that the remaining untainted evidence did not establish probable cause to search the defendant's home for the broad

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

range of firearms described in the warrant, and that as a consequence, the entire warrant was invalid and all evidence seized pursuant to it must be suppressed.

## COUNSEL

Michael J. Treman (argued), Santa Barbara, California, for Defendant-Appellant.

André Birotte Jr., United States Attorney, Robert E. Dugdale, Chief, Criminal Division, Cheryl L. O'Connor (argued) and Max B. Shiner, Assistant United States Attorneys, Los Angeles, California, for Plaintiff-Appellee.

## OPINION

WATFORD, Circuit Judge:

The issue raised by this appeal is whether the police violated Johnny Nora's Fourth Amendment rights when they searched his home. The search yielded narcotics and firearms, which formed the basis for the federal charges brought against him. After the district court denied Nora's motion to suppress the evidence seized from his home, Nora entered a conditional guilty plea pending the outcome of this appeal.

Nora contends that, although the officers obtained a search warrant, all of the evidence discovered during the search must be suppressed because the warrant was invalid. The warrant was invalid, Nora argues, because it was based on information acquired as a result of his unlawful arrest.

And his arrest was unlawful, Nora urges, because the officers either lacked probable cause to arrest him or, alternatively, arrested him in violation of *Payton v. New York*, 445 U.S. 573 (1980).

I

The events relevant here occurred on a single night in January 2008. Two uniformed police officers were patrolling Nora's neighborhood in South Central Los Angeles in an unmarked car. As they drove down Nora's street, the officers saw three men they didn't know standing on the sidewalk in front of Nora's two-bedroom house, about 75 yards away. The officers lost sight of the men for a few seconds. By the time the officers pulled up in front of the house and got out of the car, two of the three men (Nora and Andre Davis) were standing on the porch, while the third (Patrick Hodges) stood in the front yard, which was enclosed by a metal fence. *See* Appendix (photograph of front yard and porch). The officers stood on the sidewalk and attempted to engage in casual conversation with the men.

According to the officers, whose testimony the district court credited over Nora's conflicting testimony, Nora appeared nervous and stood stiffly with his right side obscured from the officers' view. Seconds into the conversation, Nora abruptly spun toward the front door and pushed past Davis to get into the house. As he did so, the officers could see that Nora was holding a blue-steel semi-automatic handgun in his right hand. One of the officers shouted "Stop! Police!" but Nora and Davis ignored the command, rushed into the house, and shut the door behind them.

After Nora and Davis fled into the house, one of the officers detained Hodges, who was still standing in the front yard, while the other officer ran around the side of the house to watch the back door. Someone inside the house turned off the only light that had been on, leaving the house completely dark. The officers then called for backup. Within minutes, some 20 to 30 officers arrived and surrounded the house with weapons drawn. They were aided by a police helicopter hovering above whose lights, Nora's wife testified, lit up the house "like the daytime."

A standoff ensued for the next 20 to 30 minutes, which ended when the officers used a public address system to order the occupants of the house to come out. Nora and Davis complied, followed a few minutes later by Nora's wife and children.

Officers immediately handcuffed Nora and searched him. They found a small amount of marijuana and more than $1,000 in cash on his person. One of the officers read Nora the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and then briefly questioned him. Nora made several incriminating statements in response to those questions. Specifically, Nora admitted that he had personal use quantities of methamphetamine and heroin in a dresser drawer, that he lived at the house, and that he belonged to a particular street gang. After determining Nora's identity, the officers ran a criminal background check, which revealed that Nora had a prior conviction for carrying a loaded firearm and two prior convictions for being a felon in possession of a firearm.

The officers sought and obtained a warrant to search Nora's home for the following items: marijuana,

methamphetamine, heroin, and related paraphernalia; evidence relating to the sale of narcotics; firearms, magazines, and ammunition; and evidence of gang membership. The affidavit supporting the warrant relied on the officers' observations of Nora outside his home, as well as the evidence obtained as a result of Nora's arrest—namely, the marijuana and cash found on his person, his post-arrest statements, and the record of his prior convictions. Among other things, the search of Nora's home resulted in seizure of the following:

- From an ironing-board closet hidden behind the refrigerator: quantities of cocaine, cocaine base, marijuana, over $9,000 in cash, and four semi-automatic handguns.

- From a bedroom dresser drawer: quantities of heroin and methamphetamine.

- From the detached garage: quantities of cocaine base, one handgun, one rifle, two shotguns, two electronic scales, handgun magazines, and ammunition.

A federal grand jury charged Nora with possession with intent to distribute controlled substances, possession of firearms in furtherance of a drug trafficking offense, possession of an unregistered firearm, and one count of being a felon in possession of a firearm. Nora entered a conditional guilty plea to possession of cocaine base with intent to distribute, reserving his right to appeal the district court's denial of his suppression motion. The court ultimately sentenced Nora to 122 months in prison.

## II

Nora first contends that the officers lacked probable cause to arrest him.  The government counters that the officers had probable cause to arrest Nora for violating California Penal Code § 25850(a) (formerly § 12031(a)).  That statute, as relevant here, makes it a misdemeanor to carry a loaded firearm "while in any public place or on any public street." § 25850(a).[1]

The officers' firsthand observations of Nora on the porch undoubtedly gave them probable cause to believe he was carrying a firearm.  But for purposes of § 25850(a), Nora's front porch is not a "public place."  *See People v. Strider*, 100 Cal. Rptr. 3d 66, 74 (Ct. App. 2009).  The question, then, is whether the officers had probable cause to believe both that Nora had been carrying the firearm while standing on the sidewalk (which is a public place), and that the firearm was loaded.

The officers' observations gave rise to a "fair probability" that Nora had been carrying the handgun while standing on the sidewalk.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983). That's where the officers first saw him, and they lost sight of him for only a few seconds before they next saw him standing on the porch with the gun in his hand.  They did not see him pick up anything or accept anything from Davis or Hodges while on the porch.  Given the short interval during which the

---

[1] "A person is guilty of carrying a loaded firearm when the person carries a loaded firearm on the person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory." Cal. Penal Code § 25850(a).

officers lost sight of Nora, they had reasonable grounds to believe that the firearm they saw him holding on the porch had been in his hand just moments earlier on the sidewalk as well. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

The facts known to the officers also established a fair probability that the firearm was loaded. The particular firearm involved here—a semi-automatic handgun—is principally used for self-defense and protection of the home, *see District of Columbia v. Heller*, 554 U.S. 570, 628 (2008), purposes served most effectively if the weapon is loaded. The officers saw Nora carrying the handgun at night outside a home in which he later sought refuge, suggesting he was in fact carrying the handgun for those purposes. As the district court noted, the fact that Nora carried the handgun in his hand "at the ready" strengthened the inference it was loaded; it wasn't stored in a gun case or left unattended in a vehicle, circumstances in which a firearm might more plausibly be unloaded. And Nora's unprovoked flight into the house upon seeing the officers added further weight to the inference that criminal wrongdoing might be afoot. *See Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000); *Sibron v. New York*, 392 U.S. 40, 66–67 (1968). These facts, taken together, provided a reasonable basis for believing Nora had violated § 25850(a).

Nora argues that it's possible he picked up the handgun between the time he was standing on the sidewalk and the time he reached the porch, and that the gun could have been unloaded. But the concept of probable cause requires us to deal in probabilities, not certainties, and for that reason it doesn't demand "the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). Taking into account the totality of the circumstances, the

officers needed to have only a "reasonable ground" for believing Nora had violated § 25850(a). *Pringle*, 540 U.S. at 371. Here, they did.

### III

Nora next contends that, even if the officers had probable cause to arrest him, they arrested him in violation of *Payton v. New York*, 445 U.S. 573 (1980). The Court held in *Payton* that the Fourth Amendment forbids arresting a suspect inside his home unless the police first obtain an arrest warrant or an exception to the warrant requirement applies. *Id.* at 590. That rule is designed to protect "the privacy and the sanctity of the home," *id.* at 588, and stems from "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic." *Id.* at 601.

The government properly concedes that the police arrested Nora "inside" his home for purposes of the *Payton* rule. Although officers physically took Nora into custody outside his home in the front yard, they accomplished that feat only by surrounding his house and ordering him to come out at gunpoint. We've held that forcing a suspect to exit his home in those circumstances constitutes an in-home arrest under *Payton*. *See, e.g.*, *Fisher v. City of San Jose*, 558 F.3d 1069, 1074–75 (9th Cir. 2009) (en banc); *United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985). Since the officers didn't obtain an arrest warrant, Nora's arrest violated the Fourth Amendment unless an exception to the warrant requirement applies.

The government argues, and the district court found, that the "exigent circumstances" exception to the warrant requirement applies. That exception permits a warrantless in-

home arrest in certain narrowly defined circumstances. *See United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010). One such circumstance is where the government can show that the delay necessary to secure a warrant would create "a substantial risk of harm to the persons involved or to the law enforcement process." *Al-Azzawy*, 784 F.2d at 894 (internal quotation marks omitted).

Nora didn't present the kind of immediate threat to the safety of officers or others necessary to justify a disregard of the warrant requirement. Our decision in *Al-Azzawy* provides a useful contrast. In that case the defendant refused commands to exit his home a short time after he threatened to shoot his neighbor, to light his neighbor's trailer on fire, and to "blow up" the entire trailer park in which the two lived if the neighbor bothered the defendant's family again. *Id.* at 891, 894. Officers were told that the defendant had also threatened the neighbor with a pistol the day before and had been seen in possession of hand grenades and automatic weapons a few days earlier. *Id.* at 891. We held that exigent circumstances justified the defendant's warrantless in-home arrest because the officers reasonably believed that he "possessed illegal explosives and was in an agitated and violent state." *Id*. at 894. Even on those facts, we said the exigency question was close. *Id.*

The facts of this case are decidedly less compelling from an exigency standpoint than those in *Al-Azzawy*. True, the officers saw Nora in possession of a handgun. But Nora never aimed the weapon at the officers or anyone else, and the officers had no evidence that he had used or threatened to use it. *Cf. Fisher*, 558 F.3d at 1072–73 (suspect aimed rifle at officers and threatened to shoot). The officers had no reason to believe that illegal weapons such as explosives were

present inside Nora's home, or that anyone else to whom Nora may have posed a danger was inside. Nor had Nora given any other indication that he was in "an agitated and violent state." *Al-Azzawy*, 784 F.2d at 894. Finally, the officers had no reason to believe Nora might pose a danger to the public by attempting to flee, since they had the house completely surrounded and could monitor all exit points. *See United States v. Gooch*, 6 F.3d 673, 679 (9th Cir. 1993) (defendant resting in closed tent posed no present danger to officers or other campers, despite having discharged firearm in crowded campground hours earlier).

Our conclusion that no exigency existed is buttressed by the fact that the offense involved here was a misdemeanor. At the time the officers ordered Nora to exit his home, they had probable cause to believe he had committed only a misdemeanor violation of California Penal Code § 25850(a).[2] The Supreme Court has said we should be hesitant to find exigent circumstances "when the underlying offense for which there is probable cause to arrest is relatively minor." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). Reflecting that hesitancy, we've held that "an exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home." *Hopkins v. Bonvicino*, 573 F.3d 752, 769 (9th Cir. 2009) (internal quotation marks omitted). In our view, this isn't one of the rare cases in which exigent circumstances can be found notwithstanding the relatively minor nature of the offense involved.

---

[2] The officers were not yet aware of Nora's criminal history, which would have elevated the offense to a felony. *See* Cal. Penal Code § 25850(c)(1).

IV

Having concluded that the officers had probable cause to arrest Nora but made the arrest in violation of *Payton*, we must next decide whether the evidence obtained as a result of Nora's unlawful arrest should be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 484–88 (1963). That evidence falls into three categories: (1) the cash and marijuana found on Nora during the pat-down search incident to his arrest; (2) Nora's post-arrest statements admitting gang membership and the presence of personal use quantities of narcotics in the house; and (3) information relating to Nora's identity—in particular, the record of his past convictions.

A

As to the cash and marijuana found on Nora's person, our analysis is guided first and foremost by *New York v. Harris*, 495 U.S. 14 (1990), which established the scope of the exclusionary rule's application following a *Payton* violation. In *Harris*, police had probable cause to arrest the defendant but arrested him in his home without a warrant or exigent circumstances. The defendant made incriminating statements while still inside his home, and later signed a written confession incriminating himself at the police station. The Court noted that the statements made inside the home were properly suppressed. *Id.* at 20. But the Court held that the written statement made at the police station was not subject to suppression, reasoning that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton*." *Id.* at 21.

The Court refused to suppress the statement made outside the home because doing so would not have advanced the deterrent purpose the exclusionary rule is designed to serve. That purpose is served, the Court held, only by suppressing evidence that "is in some sense the product of illegal governmental activity." *Id.* at 19 (internal quotation marks omitted). In the context of a *Payton* violation, the illegality doesn't consist of gaining custody of the defendant; the existence of probable cause to arrest provides a lawful basis for that intrusion upon the defendant's liberty. *Id.* at 18. Instead, the illegality consists of the officers' intrusion into the privacy and sanctity of the home without prior judicial authorization. *Id.* at 17. Only evidence that the police discover as a result of having made the arrest "in the home rather than someplace else" can be deemed the product of a *Payton* violation. *Id.* at 19.

Both the Supreme Court and our court have held that we must suppress evidence seized during a pat-down search of the defendant's person following a *Payton* violation. *See Kirk v. Louisiana*, 536 U.S. 635, 637–38 (2002) (per curiam); *United States v. Blake*, 632 F.2d 731, 733, 736 (9th Cir. 1980). Those cases involved *Payton* violations in which the police physically intruded into the home and conducted the pat-down search while still inside. The question before us is whether the rule of *Kirk* and *Blake* should be applied to *Payton* violations involving a suspect who, like Nora, is forced to exit his home in response to police coercion, such that the pat-down search takes place outside the physical confines of the home. The Sixth Circuit appears to have applied the rule in these circumstances, albeit without analysis. *See United States v. Saari*, 272 F.3d 804, 807, 812 (6th Cir. 2001) (upholding suppression of handgun found in

defendant's waistband after police ordered him to exit his home).

Deciding whether to apply a rule to a new factual scenario requires knowing something of the rule's rationale. Although the exact rationale underlying the rule established in *Kirk* and *Blake* wasn't articulated, each of the potential rationales supports extending the exclusionary rule to the scenario at issue here. On the one hand, the rule could be based simply on the notion that a *Payton* violation renders an arrest unlawful, and a search incident to an unlawful arrest is itself always unlawful, wherever it happens to occur. If *Kirk* and *Blake* rest on that rationale, then deciding the suppression issue before us is easy: The cash and marijuana found during the search incident to Nora's unlawful arrest must be suppressed, even though the search occurred outside his home in the front yard.

On the other hand, *Kirk* and *Blake* could rest on the notion that, when the police arrest a suspect by physically intruding into his home without a warrant, any personal effects found on his person must be suppressed in order to protect the privacy and sanctity of the home. An individual might wear or carry things on his person within the confines of his home that he wouldn't take with him when venturing out in public, so items discovered during a pat-down search conducted inside the home could well be "the fruit of having been arrested in the home rather than someplace else." *Harris*, 495 U.S. at 19. Viewed in that light, *Payton*'s protection of the privacy and sanctity of the home would be incomplete if it didn't extend to the person of a suspect arrested inside his home.

That same rationale applies when the police violate *Payton* by ordering a suspect to exit his home at gunpoint. The home receives special constitutional protection in part because "at the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Payton*, 445 U.S. at 589–90 (internal quotation marks and alterations omitted). When the police unreasonably intrude upon that interest by ordering a suspect to exit his home at gunpoint, the suspect's opportunity to collect himself before venturing out in public is certainly diminished, if not eliminated altogether. In this context, too, *Payton*'s protection of the privacy and sanctity of the home would be incomplete if it didn't extend to the person of a suspect forced to abandon the refuge of his home involuntarily.

For these reasons, evidence seized during a pat-down search incident to an arrest made in violation of *Payton* must be suppressed, whether the search occurs inside the home, as in *Kirk* and *Blake*, or outside the home, as in this case. In either scenario, evidence found on the suspect's person should be regarded as "the fruit of having been arrested in the home rather than someplace else." *Harris*, 495 U.S. at 19. Accordingly, the cash and marijuana seized during the search incident to Nora's arrest must be suppressed.

B

We conclude that Nora's post-arrest statements are subject to suppression as well. Under our decision in *United States v. Shetler*, 665 F.3d 1150 (9th Cir. 2011), Nora's statements must be deemed the fruit of the unlawful search of his person.

In *Shetler*, the police conducted an extensive illegal search of the defendant's home while the defendant was detained outside, watching as the search progressed. *Id.* at 1154. Officers found evidence of methamphetamine production in the house and garage. When questioned by the police 36 hours later, the defendant confessed to having engaged in methamphetamine production. We held that the defendant's confession was the product of the illegal search and had to be suppressed. We noted that in these circumstances officers will likely use evidence gleaned from the illegal search in questioning the suspect, and the suspect's answers "may be influenced by his knowledge that the officials had already seized certain evidence." *Id.* at 1158. Because the government bore the burden of proving that the defendant's confession was not "fruit of the poisonous tree," *id.* at 1157, the government was required to produce evidence demonstrating that the defendant's answers "were not induced or influenced by the illegal search." *Id.* at 1158. The government failed to do so.

The same is true here. Nora's incriminating statements followed immediately on the heels of the unlawful search of his person, which yielded marijuana and a large amount of cash. Whether the police questioned Nora about that evidence or not, his answers were likely influenced by his knowledge that the police had already discovered it. As in *Shetler*, the government produced no evidence to the contrary. Nor has the government shown that intervening circumstances rendered the connection between Nora's statements and the illegal search "so attenuated as to dissipate the taint." *Id.* at 1159 (internal quotation marks omitted). Nora's post-arrest statements must therefore be suppressed.

C

As to Nora's identity—in particular, the record of his prior convictions—we need not decide whether that evidence is admissible. We will assume that it is, resolving any doubts on that score in the government's favor. As will become clear, even on that assumption, we conclude that the government cannot prevail.

V

In light of what we've said above, some of the evidence included in the search warrant affidavit was admissible and some of it wasn't. The remaining question is whether that fact renders the search warrant invalid in whole or in part.

A search warrant isn't rendered invalid merely because some of the evidence included in the affidavit is tainted. *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994). The warrant remains valid if, after excising the tainted evidence, the affidavit's "remaining untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Id*. (internal quotation marks omitted); *see also United States v. Grandstaff*, 813 F.2d 1353, 1355 (9th Cir. 1987). Thus, after excising the cash and marijuana found on Nora's person and his post-arrest statements, we must determine whether the remaining untainted evidence was sufficient to support issuance of the warrant.[3] We make that determination without the usual deference owed to the magistrate's initial

---

[3] The government doesn't challenge the district court's decision to suppress evidence discovered during a protective sweep of Nora's home, which officers conducted before obtaining the warrant, so we will disregard that evidence as well.

finding of probable cause. *United States v. Kelley*, 482 F.3d 1047, 1051 (9th Cir. 2007).

Two principal pieces of evidence remain after excising the tainted evidence from the affidavit: (1) the officers' observation of Nora with a handgun under circumstances establishing probable cause to believe he had violated California Penal Code § 25850(a); and (2) the officers' knowledge of Nora's criminal history, in particular his prior conviction for carrying a loaded firearm and his two prior convictions for being a felon in possession of a firearm.

This remaining, untainted evidence did not provide probable cause to search Nora's home for marijuana, heroin, and methamphetamine, or for evidence of gang membership, all of which were listed in the warrant as items subject to seizure. Those portions of the warrant are therefore invalid. That leaves the portion of the warrant authorizing the seizure of "[f]irearms, assault rifles, handguns of any caliber and shotguns of any caliber," as well as ammunition for such firearms. We must decide whether that portion of the warrant is valid; if it is, the severance doctrine might apply. *See United States v. Gomez-Soto*, 723 F.2d 649, 654 (9th Cir. 1984) (noting that, if applicable, the severance doctrine "allows us to strike from a warrant those portions that are invalid and preserve those portions that satisfy the fourth amendment").

To satisfy the Fourth Amendment, the warrant's firearms clause must be supported by probable cause and describe with particularity the items to be seized. *United States v. Sells*, 463 F.3d 1148, 1156 (10th Cir. 2006); *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991). Because we conclude that the firearms clause was not

supported by probable cause, we need not decide whether the clause satisfies the particularity requirement.

The untainted evidence unquestionably provided probable cause to search Nora's home for the blue-steel semi-automatic handgun the officers saw him carrying. Nora ran into the house with the gun in his hand but exited without it, giving the officers reason to believe it was still inside. The gun was of course evidence of the crime for which the officers had probable cause to arrest him and would therefore have been subject to seizure on that basis alone. But without more, the officers' firsthand observations of Nora with a gun in his hand did not give them reasonable grounds to believe that any additional firearms would be found in the house. *See Millender v. Cnty. of Los Angeles*, 620 F.3d 1016, 1025 (9th Cir. 2010) (en banc), *rev'd on other grounds sub nom. Messerschmidt v. Millender*, 132 S. Ct. 1235 (2012).

The only other arguably untainted evidence the officers had was knowledge of Nora's criminal history. We have stated that criminal history "can be helpful in establishing probable cause, especially where the previous arrest or conviction involves a crime of the same general nature as the one the warrant is seeking to uncover." *Greenstreet v. Cnty. of San Bernardino*, 41 F.3d 1306, 1309 (9th Cir. 1994); *see also* 2 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 3.2(d), at 72 & n.147 (5th ed. 2012). For example, in *Hart v. Parks*, 450 F.3d 1059 (9th Cir. 2006), we noted that the suspect's prior theft convictions were "particularly relevant" (when combined with other evidence) to determining whether the police had probable cause to arrest him for another theft. *Id.* at 1066.

By the same logic, Nora's prior firearms convictions might have been relevant if the officers had observed Nora holding an object that appeared to be a firearm, and the issue was whether the officers had probable cause to believe the object was in fact a firearm. But here, the officers didn't need the prior convictions to support the inference that Nora in fact possessed a firearm; they already had probable cause to believe that. Rather, at issue is whether a fair probability existed that Nora owned *other* firearms, in addition to the single firearm the officers had observed. Nora's prior firearms convictions don't speak to that issue and thus are of marginal relevance to the probable cause issue before us.

Our decision in *United States v. Weber*, 923 F.2d 1338 (9th Cir. 1991), illustrates the shortcoming here. In *Weber*, the defendant ordered four photographs of children engaged in sexually explicit acts from a fictitious distributor created as part of a government-orchestrated sting operation. *Id.* at 1340. The agents planned to deliver the photographs to the defendant's home through a mail courier. They then sought an anticipatory warrant to search the defendant's home, not just for the four photographs he had ordered, but for any other photographs, books, magazines, and videotapes depicting child pornography. *Id.* at 1340–41. To justify this much broader search for child pornography, the warrant affidavit contained an officer's expert opinion regarding three classes of suspects likely to keep such materials at home ("child molesters," "pedophiles," and "child pornography collectors"). *Id.* at 1341. We found the evidence insufficient to establish probable cause to search for materials beyond the four photographs involved in the sting. Although the expert's opinion described three classes of suspects likely to possess the broad range of child pornography materials described in

the warrant, the government failed to demonstrate that the defendant belonged to one of those classes. *Id.* at 1341, 1345.

Here, the government's evidence is insufficient for the opposite reason: The affidavit established that Nora belonged to a class of suspects with prior firearms convictions, but didn't show why that class of suspects would tend to own multiple firearms. Nor did the affidavit contain other facts tying Nora himself to firearms beyond the one he had been observed carrying. Were we to hold that this evidence suffices for probable cause, officers would have free rein to search a suspect's home anytime the suspect had prior firearms convictions and was spotted with a single gun, whether near his home or not. While the police in those circumstances might have probable cause to search for the specific firearm they observed, they would need evidence tending to show that the suspect in question—or the class of people to which the suspect belonged—possessed additional firearms to justify a more expansive search. As we stated in *Weber*, "probable cause to believe that *some* incriminating evidence will be present at a particular place does not necessarily mean there is probable cause to believe that there will be more of the same." *Id.* at 1344.

We are thus left with no portion of the warrant that satisfies the Fourth Amendment's requirements. The officers had probable cause to search for the blue-steel semi-automatic handgun they saw Nora carrying, but the only clause of the warrant addressing firearms did not specifically describe that weapon. It instead purported to authorize the seizure of firearms of any stripe, expanding the scope of the search to include firearms for which the officers did not have probable cause. Since a warrant must "be no broader than the probable cause on which it is based," *id.* at 1342, the firearms

clause must be stricken as well. With no valid portion of the warrant that could even potentially be saved, the severance doctrine cannot apply.

Because the entire warrant was invalid, the government's plain view argument also fails. In order for the plain view doctrine to apply, "the officer must lawfully have been in the place from which the object could be seen in plain view." *United States v. Galpin*, 720 F.3d 436, 451 (2d Cir. 2013); *see Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). The officers' entry into Nora's home was not authorized by a valid warrant or an exception to the warrant requirement, which means they were not lawfully present in the home in the first place. The plain view doctrine is therefore inapplicable. *See United States v. Spilotro*, 800 F.2d 959, 968 (9th Cir. 1986).

*          *          *

Although Nora's arrest was supported by probable cause, the manner in which officers made the arrest violated *Payton*. Evidence obtained as a result of Nora's unlawful arrest must be suppressed, which renders the portions of the warrant authorizing a search for narcotics-related evidence and evidence of gang membership invalid. The remaining untainted evidence did not establish probable cause to search Nora's home for the broad range of firearms described in the warrant. As a consequence, the entire warrant was invalid and all evidence seized pursuant to it must be suppressed. We reverse the district court's order denying Nora's suppression motion and remand for further proceedings.

**REVERSED and REMANDED.**

**APPENDIX**

