Filed 12/8/23  P. v. Koorkoff CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| THE PEOPLE, | C094461 |
| Plaintiff and Respondent, | (Super. Ct. No. 20F07901) |
| v. | |
| ALEXANDER KOORKOFF, | |
| Defendant and Appellant. | |

This case involves a police shootout following an hours-long standoff that began when officers arrived at a residence in response to a report of a domestic altercation and possible overdose.  A jury found defendant Alexander Koorkoff guilty of two counts of willful, deliberate, and premeditated attempted murder of a peace officer (Pen. Code, §§ 664, subds. (e), (f), 187, subd. (a)),[1] four counts of assault with a firearm upon a peace

---

[1] Undesignated statutory references are to the Penal Code.

1

officer (§ 245, subd. (d)(1)), willful infliction of corporal injury upon a spouse resulting in a traumatic condition (§ 273.5, subd. (a)), and assault with a firearm (§ 245, subd, (a)(2)). The jury also found true the firearm and deadly weapon enhancement allegations. (§§ 12022.53, subd. (c), 12022, subd. (b)(1).) The trial court sentenced defendant to an aggregate term of 40 years to life in prison.

Defendant appeals, arguing reversal is required due to an unlawful warrantless arrest, instructional errors, and insufficient evidence. He further asserts the matter must be remanded for resentencing because it is unclear whether the trial court knew it had discretion to impose lesser, uncharged firearm enhancements. He requests that we independently review the sealed record to determine whether the trial court erred in denying his *Pitchess*[2] motions for the discovery of peace officer personnel records and peace officer blood draw records.

After the matter was originally fully briefed on June 20, 2023, defendant requested the opportunity to address in briefing a new case regarding instructional error; we granted the request and the supplemental briefing was completed on October 16, 2023. We also requested and received additional sealed records from the trial court in order to thoroughly complete our review of the *Pitchess* hearing as requested.

As we will explain, we agree with defendant's sentencing claim. We will vacate the sentence and remand the matter for full resentencing, including for the trial court to exercise its discretion as to whether to strike any of the firearm enhancements found true

---

[2] In *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, our Supreme Court held that a criminal defendant may, in some circumstances, compel the discovery of evidence in the arresting officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1219.) While this decision has been superseded by statute, motions for discovery of law enforcement officer personnel files are still referred to as *Pitchess* motions. (*Mooc*, at p. 1225; *City of Santa Cruz v. Municipal Court* (1989) 49 Cal.3d 74, 81; *Zanone v. City of Whittier* (2008) 162 Cal.App.4th 174, 187, fn. 13.)

by the jury and impose a lesser, uncharged firearm enhancement instead.  In all other respects, we affirm the judgment.

## FACTUAL BACKGROUND

We summarize the pertinent facts in the light most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  Additional information relevant to the contentions raised on appeal will be set forth in the Discussion section, *post*.

*The Domestic Altercation and Suicide Attempt*

In 2006, defendant married M.  In April 2020, the couple lived in a two-story home in a rural part of Calaveras County.  Prior to emigrating to the United States, defendant served in "a . . . Russian army" for five years.

On April 4, 2020, defendant and M. talked for hours in their living room while drinking alcohol; the discussion included the topics of death and dying.  Around 3:00 p.m., defendant spoke by phone with M.'s priest John Van Dyck (Father John). Thereafter, defendant and M. continued to talk and drink alcohol for over an hour. During this portion of the conversation, defendant pulled out a loaded revolver.  In response, M. became upset and argued with defendant until he "black[ed] out."  While defendant was asleep, M. unloaded the gun, hid it, and then exchanged texts with Father John.

Around 5:30 p.m., M. texted Father John a photograph of the unloaded gun and insinuated that defendant had pointed it at her while "[t]rauma [was] coming out" as a result of him being a "wounded soldier."  M. told Father John that she "took" the gun, and explained that Father John's "therapeutic intervention" could have "cost" M. her life. When M. asked Father John whether he thought defendant would kill her, Father John offered to talk with defendant and "continue[] the process of healing."

Around 40 minutes later, defendant woke up and demanded to know where his gun was.  After M. explained that it was gone, they argued and he became increasingly angry.  He eventually left the living room and returned with a four-foot wooden "stick" or

3

rod.  Defendant hit M. with the rod about five times, including her shoulders and thighs.  In response, M. tossed several kitchen knives at defendant, which caused him to "disengage."  As a "reward[]," M. gave defendant his gun back.

Thereafter, M. drank wine and took pills because she felt like her marriage was over and she wanted to commit suicide.  When the sleeping pills started to take effect, M. texted Father John.  During the ensuing text exchange, which began around 8:00 p.m., M. told Father John that "[i]t didn't go well" and that she was not "coming out [of] it."  When Father John asked M. whether she "continued" to be scared, she responded, "No, I am dying."  M. explained that she and Father John had "woke the demon," and that she was "all bruised up" but it was the 10 or so "[b]enzonatate"[3] pills that were "causing" her to die.  M. noted that her lips were going numb, but refused to seek medical attention as urged by Father John or give him her address.  M. asked Father John not to call for help.  The text exchange ended when M. fell asleep.

*The 911 Call*

Father John called 911.  During the call, which was recorded and played for the jury, Father John reported that there had been a domestic argument between M. and defendant, that M. had been drinking alcohol, and that M. may have overdosed.

*The Standoff*

Around 9:15 p.m., Deputy Conor Seawell of the Calaveras County Sheriff's Office was dispatched to the Koorkoff residence.[4]  The police dispatcher advised Deputy C.

---

[3]  At trial, M. explained that she believed the "sleeping pills" were a benzodiazepine, which is a depressant drug prescribed to treat conditions such an anxiety disorders, insomnia, and seizures.  Among the most common benzodiazepines are Valium and Xanax.

[4]  At the time of the events giving rise to this case, Deputy Conor Seawell's brother, Tyler Seawell, also worked for the Calaveras County Sheriff's Office and was dispatched

Seawell that there had been a domestic altercation between defendant and M., and that M. may have overdosed on cough syrup. While driving to the scene, C. Seawell spoke by phone with Father John, who was "pretty concerned about M." During the conversation, Father John indicated there were guns at the Koorkoff residence.

When Deputy C. Seawell arrived at the scene around 9:30 p.m., the house was completely dark and there were no outside lights on. Shortly after he knocked on the front door and announced that he was from the sheriff's office, the front porch light came on. Looking through a window next to the front door,[5] C. Seawell saw defendant holding a shotgun. In response, the deputy drew his gun and pointed it at defendant. In a loud voice, the deputy announced that he was a police officer and ordered defendant to put his gun down and come outside with his hands up. Defendant retreated into the interior of the house. The deputy returned to his car and notified dispatch there was a man inside the house with a shotgun, and waited for backup.

Three additional officers arrived at the scene within the next 10 minutes, including Deputy Ian Schlarb of the Calaveras County Sheriff's Office. Upon his arrival, Deputy Schlarb began establishing a containment perimeter by directing the other officers to take positions around the house.

Between 9:44 p.m. and 9:49 p.m., defendant spoke by phone with the police dispatcher. Defendant explained that M. had taken about eight pills containing "cough medication" and was sleeping. Although defendant could not wake M. up and realized that something was "not right," he refused to allow the officers inside because he did not "trust armed people."

_____

to the Koorkoff residence. To avoid confusion, we refer to the brothers by their first initial and last name (e.g., Deputy C. Seawell).

[5] There was a window on each side of the front door that was the same height as the door.

5

At 9:49 p.m., the police dispatcher connected defendant with Deputy Schlarb. During the ensuing 18-minute conversation, which was recorded and played for the jury, defendant "sounded inebriated." He used profane language and insisted that he would only allow an unarmed person inside the house. Defendant demanded a doctor or "medical professional" several times, but Schlarb made it clear that no medical personnel would enter the house to assist M. until the scene was secure, i.e., defendant came outside with his hands up. Defendant, however, refused to do so, claiming that the officers were trespassing and that he was protected by the "fucking constitution" and his "fucking human rights." At one point, defendant said that he was not a "fucking psycho," and that if the officers "fucking seiz[ed]" and "attack[ed]" him, they would get hurt. Defendant ranted about being an American and the constitution, and said that the police could not "invade" his home. Defendant noted that he was a "dude with a gun" and that he intended on protecting his "rights" with "everything" he could. Defendant also noted that he had served in a "fucking Russian army" for five years, and that he was a "fighter" prepared to "go down in a fight" and would not go "down" with his hands up. When asked whether M. was unconscious, defendant said that he could not wake her up, explaining that she had taken some sleeping pills and was "passed out drunk." Defendant mentioned that he had also been drinking alcohol and was drunk at one point, and explained that he and M. had a "fight." When Schlarb disclosed that he did not have a warrant, defendant told the deputy to "fuck off" and threatened to shoot him if he "invad[ed]" the house. Defendant eventually ended the call by hanging up.

By 10:12 p.m., additional officers had arrived at the scene and multiple spotlights were directed at the house. At that point, an officer positioned near the front door heard M. and defendant arguing and yelling. During the argument, the officer saw defendant (through a window next to the front door) point a shotgun at M. and threaten to kill her in a loud voice. Shortly thereafter, the front door opened and defendant pushed M. outside.

6

As defendant did so, he was holding a shotgun in a "high and ready position" (i.e., pointed up), with his hand near the trigger.

When M. spoke to an officer, she was crying, smelled of alcohol, and had a red mark on her cheek and a bruise with some swelling on her forehead. M. told the officer that, earlier in the day, defendant had hit her with a stick, pointed a gun at her, and said, "I could kill you." M. was taken to the hospital after she disclosed that she had attempted to commit suicide by ingesting cough and "sleep" medicine. M. had a blood-alcohol level of 0.22.

By midnight, additional officers had arrived at the scene, including officers from the SWAT[6] Team and the Crisis Negotiation Team (CNT). At this point, the house was surrounded by numerous officers, and it was raining. Throughout the remainder of the evening and early morning hours of the standoff, it was cold, windy, and rainy.

From approximately 1:20 a.m. to 5:30 a.m., a CNT officer (negotiator) spoke by phone with defendant over the course of more than 60 separate calls,[7] advising defendant multiple times that the officers were not going to kill him and that law enforcement wanted a peaceful outcome. During these conversations, defendant was upset, agitated, and belligerent. He used profane language and demanded that the officers turn the spotlights off and leave the property because no crime had been committed. Defendant stated that he had "a bunch of fucking guns," including a shotgun loaded with buckshot shells. Defendant referenced dying numerous times, and repeatedly threatened to shoot and/or kill the officers, explaining that they were trespassing and that he had the right to shoot them. Defendant claimed that the officers intended to kill him and made it clear that he would never surrender, explaining that he would rather die "with honor" than go

---

[6] SWAT is shorthand for Special Weapons and Tactics.

[7] Due to a "technical issue," the phone calls were not recorded.

to jail.  Defendant also noted that he had served in the "Soviet Union Army" for five years and threatened to "come out with guns" and take out as many officers as possible. Defendant stated the standoff would end with him "shooting or being shot," and that he and the officers "[w]e're gonna have a shootout."

*The Shootout*

Around 5:30 a.m., the SWAT team commander, Anthony Eberhardt, authorized the use of tear gas after determining that negotiations with defendant were "stale" and that daylight would endanger the officers by exposing their positions.  Given defendant's repeated threats to harm the officers and his claim that he knew the officers' positions, Eberhardt decided to use the tear gas while it was still dark outside.  As a tactical matter, Eberhardt was concerned that the officers did not have adequate "cover" (i.e., something that would stop a bullet), and that defendant was "barricading" (e.g., fortifying doors), staging weapons, and/or creating a plan of attack.  In Eberhardt's view, the tear gas would assist the officers in obtaining a peaceful resolution to the standoff by forcing defendant to come outside.

After multiple tear gas canisters were shot into the house, a shootout occurred; defendant fired multiple gunshots at the officers, who returned fire.  The gunshots fired by defendant narrowly missed several officers, including one of the officers who deployed the tear gas--Sergeant Stevens, the SWAT team leader--and an officer assigned to provide cover for Stevens and assist with the deployment of the tear gas, Deputy Schlarb.[8]  The gunshots fired by defendant came from a 12-gauge shotgun.

During the shootout, Sergeant Stevens and Deputy Schlarb were positioned in the front of the house, approximately 25 yards from the front door.  Stevens was next to a tree and Schlarb was directly behind and to the right of him, near a shrub.  Two

---

[8]  A "40-milimeter launcher" was used to deploy the tear gas canisters, which were shot into the house by officers positioned in the front and rear of the house.

8

additional officers from the Calaveras County Sheriff's Office--Deputy T. Seawell and Deputy Jesse Green--were positioned a few yards to the right of Stevens and Schlarb. These officers were near a tree and were responsible for providing cover for Stevens.

*The Arrest*

Shortly after the shooting stopped, defendant came out of the house. He stood in the garage, armed with a holstered revolver, and asked the officers to shoot him. Because defendant refused to comply with commands to surrender and get on the ground, he was shot in the chest with a non-lethal round. Defendant then retreated back into the house.

Around 5:45 a.m., defendant was arrested after additional canisters of tear gas were shot into the house. Defendant came out the front door unarmed and was detained.

It was undisputed at trial that no attempt was made at any point during the standoff to obtain an arrest warrant.

*The Search and Investigation*

A search revealed three shotgun shell casings on the floor of the house, including one in the bedroom near a broken window, a 12-gauge shotgun in the garage with a spent shell casing in the chamber, a .22 caliber revolver, and a wooden stick consistent with a closet rod. The spent shotgun shell casings revealed that defendant fired double-aught buckshot at the officers, which are large lead balls or BBs. This type of buckshot is ordinarily used for hunting "larger game" (e.g., deer). No items were taken from the scene until a search warrant was issued later that same day.

Traces of lead were found in a wedge of wood taken from the tree that Sergeant Stevens was near during the shootout. However, no buckshot was found in the wedge of wood or in the woods outside the Koorkoff residence.

The gun found in defendant's garage was an 870 Remington pump-action shotgun, which was capable of being loaded with four 12-gauge shells. The shotgun had a "sidesaddle" on the buttstock, which contained five additional double-aught buckshot shells.

9

## DISCUSSION

## I

### *Motion to Suppress*

Defendant argues the trial court erred in denying his motion to suppress. He claims that no exigent circumstances existed to justify his warrantless in-home arrest. We disagree.

A. *Additional Background*

Defendant filed a pretrial motion to suppress, arguing that the police had conducted an unlawful warrantless search and seizure in violation of his Fourth Amendment rights. He sought to suppress all of the evidence obtained in connection with his warrantless arrest, including the items found during the search of his house. The prosecution opposed the motion.

At the suppression hearing, six officers testified and the CAD Incident Report and phone call between Deputy Schlarb and defendant were admitted into evidence. For purposes of the suppression motion, the evidence adduced at the hearing was similar to the evidence adduced at trial described *ante*, with minor immaterial differences that we need not and do not recount.

In denying the motion to suppress, the trial court found defendant was constructively arrested when officers surrounded his house and Deputy Schlarb was speaking by phone to him at approximately 9:44 p.m. The court further found that, at that time, there was probable cause to arrest defendant for delaying or obstructing a peace officer in the performance of his duty (§ 148) or for using force or violence to deter or prevent an executive officer from performing a duty imposed on the officer by law (§ 69). In so finding, the court explained that police officers were dispatched to the scene in response to a domestic argument between defendant and M. and the possible overdose of M., and that when the first officer arrived (Deputy C. Seawell), defendant was holding a shotgun and refused to allow the officer to enter the house to check on M. The court also

10

noted that, before arriving at the scene, C. Seawell was advised that the domestic argument involved M. taking a gun away from defendant. Based on these facts, the court concluded that exigent circumstances existed to justify a warrantless entry into the home.

As for exigent circumstances, the trial court additionally found as follows: "[Defendant] created . . . further exigent circumstance[s] after he made it clear that he was a threat not only to [M.] when he was seen pointing a shotgun at her and threatened to kill her but also prior to that while on the phone with Deputy Schlarb and threatening he would be willing to die in a shootout with law enforcement. The concerns that [defendant] raised by making these threats made it clear he was willing to endanger anyone else in public by engaging in a shootout with law enforcement. [¶] Further, when [M.] advised law enforcement about the earlier domestic argument pointing of the gun and physical abuse by [defendant], it became clear reasonable law enforcement would have concluded based on the totality of information available exigent circumstance to enter the Koorkoff residence and place him under arrest existed."

B. *Applicable Legal Principles*

Both the federal and state Constitutions prohibit unreasonable searches and seizures. (U.S. Const., 4th Amend.; Cal. Const., art. I, § 13.) "In California, issues relating to the suppression of evidence derived from governmental searches and seizures are reviewed under federal constitutional standards." (*People v. Troyer* (2011) 51 Cal.4th 599, 605 (*Troyer*).) Because searches and seizures inside a home without a warrant are presumptively unreasonable, the government bears the burden of establishing that exigent circumstances or another exception to the warrant requirement justified the entry. (*Id*. at pp. 602, 605.)

A seizure begins when a reasonable person, based on the totality of the circumstances, " 'would have believed that he was not free to leave.' " (*Michigan v. Chesternut* (1988) 486 U.S. 567, 573.) It is settled that a warrantless seizure--an arrest--conducted in the home is unlawful in the absence of probable cause to believe that a

11

criminal offense has been or is being committed and consent to enter or exigent circumstances. (*Payton v. New York* (1980) 445 U.S. 573, 576, 585-586, 588-589; *People v. Thompson* (2006) 38 Cal.4th 811, 817-818; *People v. Ramey* (1976) 16 Cal.3d 263, 274-276; *People v. Lujano* (2014) 229 Cal.App.4th 175, 183.)

" 'Probable cause exists when the facts known to the arresting officer would persuade someone of "reasonable caution" that the person to be arrested has committed a crime.' " (*People v. Thompson*, *supra*, 38 Cal.4th at p. 818.) The term "exigent circumstances" describes " ' "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." ' " (*People v. Panah* (2005) 35 Cal.4th 395, 465.) The United States Supreme Court has recognized that exigent circumstances may exist where "an emergency leaves police insufficient time to seek a warrant." (*Birchfield v. North Dakota* (2016) 579 U.S. 438, 456.)

While there is no "domestic violence exception to the warrant requirement" (*People v. Ormonde* (2005) 143 Cal.App.4th 282, 295), exigent circumstances justifying a warrantless entry into a residence have been found in domestic disturbance cases. (See, e.g., *People v. Frye* (1998) 18 Cal.4th 894, 989-990, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Higgins* (1994) 26 Cal.App.4th 247, 251-255; *People v. Wilkins* (1993) 14 Cal.App.4th 761, 772 (*Wilkins*).) Courts have also recognized that " 'the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid,' " and that "a warrantless entry in response to an actively suicidal person may be justified to prevent injury." (*People v. Ovieda* (2019) 7 Cal.5th 1034, 1042 [explaining that exigent circumstances have been found when a warrantless entry appears necessary to render emergency aid to an injured occupant or to protect an occupant from imminent injury, regardless of whether a crime has been committed]; see *Troyer, supra*, 51 Cal.4th at p. 606 [" 'police may enter a home without a

12

warrant when they have an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury' "].)

"The ' "emergency aid exception" ' to the warrant requirement 'does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.' [Citation.] Rather, the exception 'requires only "an objectively reasonable basis for believing" [citation] that "a person within [the house] is in need of immediate aid." ' " (*Troyer, supra*, 51 Cal.4th at p. 606.) " ' "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." ' [Citation.] ' " 'There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers.' " ' " (*Ibid*.)

When a defendant files a motion to suppress pursuant to section 1538.5, the prosecution has "the burden of proving that the warrantless search or seizure was reasonable." (*People v. Williams* (1999) 20 Cal.4th 119, 130.) " ' "In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. We review the court's resolution of the factual inquiry under the deferential substantial-evidence standard. The ruling on whether the applicable law applies to the facts is a mixed question of law and fact that is subject to independent review." [Citation.] On appeal we consider the correctness of the trial court's ruling *itself*, not the correctness of the trial court's *reasons* for reaching its decision.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364-365.) In considering the correctness of the ruling, our review is limited to the facts presented at the suppression hearing. (*People v. McKim* (1989) 214 Cal.App.3d 766, 768, fn. 1.)

C. *Analysis*

We conclude the motion to suppress was properly denied. In his opening brief, defendant does not discuss whether there were exigent circumstances and probable cause

to arrest him before M. left the house during the standoff.  Instead, defendant claims that, after M. was "securely in police protection," there were no "actionable" exigent circumstances to justify a warrantless arrest.  In support of his position, defendant insists that the hours-long standoff that followed did not "equate with an emergency."  In other words, defendant claims any exigent circumstances that may have existed prior to M. leaving the house dissipated with the passage of time, which required the officers to secure a warrant before arresting him, thereby rendering his continued seizure and the completion of his arrest unlawful.  We are unpersuaded.

We begin our analysis by noting that while defendant was ultimately taken into custody outside his home, he was, for legal purposes, seized inside his home (i.e., arrested) when armed officers took positions around his house at approximately 9:50 p.m. and he was ordered to come outside with his hands up.  Under these circumstances, a reasonable person would not have believed that he was free to leave.  (See *United States v. Nora* (2014) 765 F.3d 1049, 1054 [surrounding a suspect's home and ordering him to come out at gunpoint constitutes an in-home arrest]; *United States v. Al-Azzawy* (9th Cir. 1985) 784 F.2d 890, 893 [suspect was effectively arrested when police surrounded his trailer "with their weapons drawn and ordered him through a bullhorn to leave the trailer and drop to his knees"].)[9]

Next, we find that exigent circumstances and probable cause existed to justify defendant's in-home arrest.  The police were initially dispatched to the Koorkoff residence in response to a 911 call placed by Father John.  During this call, Father John reported that there had been a domestic argument between M. and defendant, and that M. may have overdosed.  While driving to the residence, Deputy C. Seawell spoke by phone with Father John and learned that M. had sent Father John a photograph of a gun.  When

[9] We need not and do not decide whether defendant was seized when Deputy C. Seawell ordered him to come outside with his hands up at gunpoint.

14

C. Seawell arrived at the scene around 9:30 p.m., defendant was inside the house and armed with a shotgun. Defendant, who was standing near the front door, refused to drop his gun and come outside with his hands up. Instead, he retreated into the interior of the house. M. did not come to the door and it was unclear whether she needed immediate medical attention. At that point, exigent circumstances existed to justify a warrantless entry into the house. C. Seawell could have reasonably concluded that immediate action was necessary to provide emergency aid to M. (See *People v. Ovieda*, *supra*, 7 Cal.5th at pp. 1041-1042.) Defendant's refusal to surrender and allow entry into the house provided probable cause to arrest him for delaying or obstructing a peace officer in violation of section 148, subdivision (a).

We note that the initial exigent circumstances justifying the warrantless entry were heightened by defendant's continued refusal to come outside in response to multiple requests by Deputy Schlarb between approximately 9:49 p.m. and 10:07 p.m., defendant's admission that he and M. got into a fight while drunk, defendant's inability to wake M. up after she had taken sleeping pills, his threat to hurt officers if they attempted to seize him, his threat to shoot Schlarb if he "invad[ed]" the house, and his stated willingness to "go down in a fight".

We further note that, after M. left the house around 10:12 p.m., there was probable cause to believe defendant had committed additional crimes, including corporal injury upon a spouse resulting in a traumatic condition (§ 273.5), assault with a deadly weapon (§ 245, subd. (a)(1)), and assault with a firearm (§ 245, subd. (a)(2)). M. had visible injuries on her face and told an officer that, earlier in the day, defendant had had hit her with a stick, pointed a gun at her, and said, "I could kill you." Defendant also pointed a gun at M. as she was leaving the house and threatened to kill her. Given defendant's threats to kill M. and the officers, there was also probable cause to believe defendant committed the crime of making a criminal threat. (§ 422.)

We reject defendant's contention that no exigent circumstances existed to justify the completion of his warrantless arrest after M. left the house. Implicit in this argument is the premise that any exigency that justified defendant's initial seizure had dissipated by the time he was taken into full custody hours later. A similar argument was rejected by the Ninth Circuit in a factually analogous case, *Fisher v. City of San Jose* (9th Cir. Cal. 2009) 558 F.3d 1069 at page 1071 [holding that, during an armed standoff, "once exigent circumstances justify the warrantless seizure of the suspect in his home, and so long as the police are actively engaged in completing his arrest, police need not obtain an arrest warrant before taking the suspect into full physical custody"; "[t]his remains true regardless of whether the exigency that justified the seizure has dissipated by the time the suspect is taken into full physical custody"].) We find the reasoning of *Fisher* to be sound and follow it here.

II

*Alleged Instructional Errors*

Defendant raises two claims of instructional error on appeal, which we address in turn below. As we shall explain, we find no basis for reversal.

A. *Generally Applicable Legal Principles and Standard of Review*

"Even absent a request, the trial court must instruct on the general principles of law applicable to the case. [Citation.] The general principles of law governing a case are those that are commonly connected with the facts adduced at trial and that are necessary for the jury's understanding of the case. [Citation.] The trial court must give instructions on every theory of the case supported by substantial evidence, including defenses that are not inconsistent with the defendant's theory of the case." (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)

In the context of jury instructions, substantial evidence is evidence that "would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) In

16

other words, "[s]ubstantial evidence is evidence sufficient to 'deserve consideration by the jury.' " (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8; see *People v. Young*, *supra*, 34 Cal.4th at p. 1200 ["[e]vidence is 'substantial' only if a reasonable jury could find it persuasive"].) "The trial court's determination of whether an instruction should be given must be made without reference to the credibility of the evidence. [Citation.] The trial court need not give instructions based solely on conjecture and speculation." (*Young*, at p. 1200.)

Instructions *not* supported by substantial evidence should not be given. (*People v. Marshall* (1997) 15 Cal.4th 1, 39-40.) "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) We independently review the trial court's determination that there was sufficient evidence to give a particular instruction. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1206.)

B. *Kill Zone Instruction*

Defendant initially argues the trial court committed reversible error by instructing the jury on the "kill zone" theory of attempted murder. He claims there was insufficient evidence to support the instruction. We see no error.[10]

---

[10] The Attorney General insists that defendant forfeited his claim of instructional error. While defendant failed to object to the kill zone instruction, we will address his claim on the merits because the asserted error affects his substantial rights. (§ 1259; *People v. Tran* (2018) 20 Cal.App.5th 561, 565, fn. 2.)

### 1. *Additional Background*

The information charged defendant in counts I and II with the attempted murder of Sergeant Stevens and Deputy Schlarb (§§ 664, subds. (e), (f), 187, subd. (a)), and alleged that the offenses were committed willfully, deliberately, and with premeditation.

At trial, Stevens and Schlarb both testified. As noted *ante*, Stevens was the SWAT team leader. During the standoff, he was responsible for gathering information and formulating a plan to safely detain defendant. Given defendant's repeated threats to shoot and kill the officers, Stevens determined that tear gas canisters should be shot into the house to force defendant outside. Stevens further determined that, as a tactical matter, the tear gas should be deployed while it was dark outside, as the area surrounding defendant's home did not have "a lot of cover" for the officers (i.e., something that would stop a bullet).

After Sergeant Stevens's plan was approved by his supervisor (Eberhardt), Stevens moved into position in front of the house and prepared to deploy the tear gas using a 40-milimeter launcher; his cover was a tree. Deputy Schlarb, who was positioned directly behind and to the right of Stevens, was responsible for assisting Stevens with the deployment of the tear gas and providing cover for him; Schlarb was located behind a shrub. The officers were approximately 25 yards from the front door.

As Sergeant Stevens was preparing to deploy the tear gas, another officer positioned nearby accidentally turned on a flashlight and "backlit" (i.e., illuminated) the location of Stevens and Deputy Schlarb. Immediately after Stevens shot several tear gas canisters into the house, he heard a loud pop and then a "slamming, whizzing" noise that went right over his head. Stevens explained that the gunshots fired in his direction sounded very similar to shotgun blasts and that he saw additional "rounds" striking the tree and ground near him; rounds flew about a foot or so over his head and pieces of the tree and dirt hit his face. Stevens explained that the tree was blown to "smithereens" by a shotgun blast, and that another shotgun blast "exploded" the shrub and dirt directly in

18

front of him. Stevens described the shotgun blast that hit the shrub as a "mini cannonball explosion."

Following the deployment of the tear gas, Deputy Schlarb saw a muzzle flash inside the house and then felt a rush of air go by his head from a gunshot. Shortly thereafter, Schlarb felt a second gunshot go by his head, which hit the tree next to Sergeant Stevens. Stevens also saw muzzle flashes inside the house following the deployment.

In response to the gunshots, Sergeant Stevens and Deputy Schlarb went to the ground to avoid being shot. Schlarb grabbed Stevens's ankles and pulled him away from the tree. Before returning fire, Stevens heard three to four shots.

At trial, Deputy Schlarb testified that there were holes in the tree from a gunshot, and Sergeant Stevens testified that he saw a pattern of buckshot in the tree.

Two officers testified that they saw the muzzle flash from Sergeant Stevens's tear gas launcher. When asked, Stevens explained that the tear gas launcher emits a "very bright" muzzle flash when fired, noting that the flash would light up the entire courtroom. Thus, in addition to the flashlight, the muzzle flash of the tear gas launcher exposed Stevens's position.

There was evidence that double-aught buckshot shotgun shells contain "nine fairly large lead balls" that would have been lethal from the distance Sergeant Stevens and Deputy Schlarb were taking fire.

Prior to deliberations, the trial court instructed the jury on attempted murder pursuant to CALCRIM No. 600. In relevant part, the instruction provided as follows:

"The defendant is charged in Counts I and II with attempted murder.

"To prove that the defendant is guilty of attempted murder, the People must prove that:

"1. The defendant took at least one direct but ineffective step toward killing another person;

19

"AND

"2.  The defendant intended to kill that person.

"A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder.  A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action.  A direct step indicates a definite and unambiguous intent to kill.  It is a direct movement toward the commission of the crime after preparations are made.  It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

"A person may intend to kill a primary target and also a secondary target within a zone of fatal harm or 'kill zone.'  A 'kill zone' is an area in which the defendant used lethal force that was designed and intended to kill everyone in the area around the primary target.

"In order to convict the defendant of the attempted murder of Ian Schlarb the People must prove that the defendant not only intended to kill Kevin Stevens but also either intended to kill Ian Schlarb, or intended to kill everyone within the kill zone.

"In determining whether the defendant intended to kill Ian Schlarb, the People must prove that (1) the only reasonable conclusion from the defendant's use of lethal force, is that the defendant intended to create a kill zone; and (2) Ian Schlarb was located within the kill zone.

"In determining whether the defendant intended to create a 'kill zone' and the scope of such a zone, you should consider all of the circumstances including, but not limited to, the following:

"The type of weapon used;

"The number of shots fired;

"The distance between the defendant and Ian Schlarb;

"The distance between Ian Schlarb and the primary target.

"If you have a reasonable doubt whether the defendant intended to kill Ian Schlarb or intended to kill Kevin Stevens by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Ian Schlarb."

20

During closing argument, the prosecutor argued that defendant intended to kill Sergeant Stevens because he fired multiple, accurate 12-gauge shotgun blasts at Stevens from a "lethal" range. The prosecutor relied on a kill zone theory to prove defendant's intent to kill Deputy Schlarb. In support of his position, the prosecutor noted that Schlarb was next to Stevens when defendant opened fire, and that the projectiles from the shotgun blasts narrowly missed the two. The prosecutor asserted that defendant's intent to kill was shown by his threats to shoot and kill the officers, his insistence that "jail [was] not going to happen," and his stated willingness to die in a shootout.

### 2. *Applicable Legal Principles*

Attempted murder requires " 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) "Intent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*Ibid*.) "Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' " ' " (*Ibid*.) "[T]he crime of attempted murder is not divided into degrees." (*Id*. at p. 740.) The prosecution may, as it did here, "seek a jury finding that an attempted murder was 'willful, deliberate, and premeditated' for purposes of sentence enhancement." (*Ibid*.)

" 'To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.' [Citation.] Whether the defendant acted with specific intent to kill 'must be judged separately as to each alleged victim.' " (*Smith, supra*, 37 Cal.4th at p. 740.) "[T]he mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. [Citation.] The act of firing toward a victim at a close, but not point blank,

range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." ' " (*Id.* at p. 741.)

The specific intent to kill may also be inferred under the concurrent intent (or "kill zone") theory. (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*); *People v. Bland* (2002) 28 Cal.4th 313, 331, fn. 6.) Under the kill zone theory, "a shooter may be convicted of multiple counts of attempted murder . . . where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim." (*Smith, supra*, 37 Cal.4th at pp. 745-746.) " 'This concurrent intent [i.e., "kill zone"] theory is not a legal doctrine requiring special jury instructions . . . . Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.' " (*Id.* at p. 746.) "When the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, however, evidence of a primary target is required." (*Canizales*, at p. 608.)

"[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm--that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death--around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm. [¶] In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired

(where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales, supra*, 7 Cal.5th at p. 607.) "[T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Ibid*.)

In *Canizales*, gang members Bolden and Pride were at a neighborhood block party when Canizales and his companion (Windfield), from a rival gang, drove up and Windfield opened fire. (*Canizales*, *supra*, 7 Cal.5th at pp. 598-599.) Both Bolden and Pride took off running, Bolden running straight up the street and Pride zigzagging back and forth across the street and hiding behind a bus on the same side of the street where Leica Cooksey and some of her friends were listening to music and dancing. Bolden recalled that bullets were " 'going everywhere.' " Bolden and Pride were not hit, but Cooksey was struck in the abdomen and later died. Five shots had been fired from between 100 and 160 feet away from Bolden, Pride, and Cooksey. (*Id*. at p. 600.)

Our Supreme Court reversed Canizales's conviction for the attempted murder of Bolden because there was insufficient evidence to support the kill zone theory. (*Canizales, supra*, 7 Cal.5th at p. 609.) The court concluded that there was insufficient evidence "to support a reasonable inference that defendants intended to create a zone of fatal harm around a primary target [i.e. Pride]." (*Id*. at p. 610.) In support of this conclusion, the court reasoned: "[T]he evidence at trial showed that Windfield attacked his target by firing five bullets from a nine-millimeter handgun at a distance of either 100 or 160 feet away. Moreover, the attack occurred at a block party on a wide city street, not in an alleyway, cul-de-sac, or some other area or structure from which victims would

have limited means of escape. As Bolden described it, the bullets were 'going everywhere' and 'tingling through the gates' as he and Pride ran down the street away from the gunfire after the first shot was fired. [¶] Even accepting as more credible the prosecution's evidence that Windfield was 100 feet rather than 160 feet away from Pride and Bolden when he first fired in their direction, we conclude that a fact finder could not reasonably infer defendants intended to create a zone of fatal harm around Pride based on the record in this case. The evidence presented here showed that from a substantial distance Windfield shot five bullets in the direction of a target who immediately ran down a city street after the first shot was fired. This evidence was insufficient to support instruction on the kill zone theory." (*Id*. at p. 611.)

Canizales* cited and relied on the court's prior decision in *Bland*, which "expressly embraced the concept of a *concurrent* intent to kill as a permissible theory for establishing the specific intent requirement of attempted murder." (*Canizales, supra*, 7 Cal.5th at p. 602.) "*Bland* applied what is now commonly referred to as the 'kill zone' theory to uphold the attempted murder convictions in that case. The record there showed that the defendant and a fellow gang member approached a car in which a rival gang member was sitting in the driver's seat and opened fire with a .38-caliber handgun, shooting numerous rounds both into the vehicle and at the vehicle as it drove away. The driver was killed and his two passengers, who were not gang members, were wounded. [Citation.] We concluded that the evidence 'virtually compelled' a finding that even if the defendant primarily intended to kill the rival gang member, he also, concurrently, intended to kill the passengers in the car, or, at the least, intended to create a zone of fatal harm." (*Id*. at p. 603.)

### 3. *Analysis*

We find there was substantial evidence to support the kill zone instruction, that is, sufficient evidence from which a rational jury could have concluded beyond a reasonable doubt that defendant acted with the requisite specific intent to kill Sergeant Stevens and

24

Deputy Schlarb. The circumstances of this case are more analogous to the facts in *Bland* than those in *Canizales*. As we have outlined above, here the record reflects that, from a "lethal range," defendant fired multiple gunshots from a 12-gauge shotgun in the direction of Stevens and Schlarb, who were positioned next to each other about 25 yards from defendant. Both officers went to the ground to avoid the double-aught buckshot discharged from the shotgun blasts, which narrowly missed them. Some of the buckshot went over the officers' heads while other buckshot struck the ground and objects near them. The evidence adduced at trial showed that defendant had served in the military and could have seen the muzzle flashes when Stevens shot the tear gas canisters into the house. There was also evidence that, during the standoff, defendant threatened to shoot and kill the officers multiple times, stated that he knew the officers' positions and was willing to engage in a shootout, and refused to surrender because he would rather die than go to jail.

On this record, a rational jury could have inferred that defendant acted with the intent to kill Sergeant Stevens specifically. (*Smith, supra*, 37 Cal.4th at p. 742 [the "act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice"].) A rational jury could also have inferred that defendant had the specific intent to kill Deputy Schlarb under a concurrent intent (i.e., kill zone) theory because he was located in the zone of fatal harm created by defendant when he fired multiple shotgun blasts at his primary target, Stevens.

Although we recognize that the *Canizales* court held that "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk' " (*Canizales, supra*, 7 Cal.5th at p. 607), here the type and extent of the force used by defendant, the distance between defendant and Sergeant Stevens, and the proximity of Deputy Schlarb to Stevens, support the conclusion that defendant intended to kill everyone within the immediate area of Stevens, including Schlarb. There is no

requirement, as defendant suggests, that a defendant be aware of who is in the zone of fatal harm to support a conviction for attempted murder based on a kill zone theory. (See *People v. Vang* (2001) 87 Cal.App.4th 554, 564 [rejecting defendants' argument that they could not be convicted of attempted murder as to someone they did not know was in the residence when they opened fire at the residence]; see also *People v. Adams* (2008) 169 Cal.App.4th 1009, 1023 ["[w]hether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense, as long as the victims actually were within the zone of harm"].) Finally, we note that, in addition to the circumstances of the shooting, there was evidence of motive--defendant's repeated threats to shoot and kill the officers--that supported a finding of defendant's intent to kill Stevens by killing everyone in his vicinity. (See *Smith, supra*, 37 Cal.4th at p. 751 [evidence of motive can support intent to kill].)

Defendant argues the evidence was insufficient to support the kill zone theory instruction because: (1) defendant could not identify a primary target, as he could not see Sergeant Stevens due to the weather, the spotlights on the house, and because Stevens was behind a tree; (2) the weapon used (i.e., 12-gauge shotgun) was not a sufficiently high-powered weapon; (3) the gunshots (three or four) were fired from a distance—approximately 75 feet from Stevens; (4) Stevens and Deputy Schlarb were not confined to a small space and could have moved "further [*sic*] back into the darkness behind the tree line." While defense counsel could have certainly made these arguments to the jury, they are not dispositive as to the sufficiency of the evidence to support a kill zone instruction.

We recognize that a trial court should only instruct the jury on the kill zone theory "in those cases where the court concludes there is sufficient evidence to support a jury determination that the *only* reasonable inference from the circumstances of the offense is that a defendant intended to kill everyone in the zone of fatal harm." (*Canizales, supra*, 7 Cal.5th at p. 608.) However, we need only decide whether sufficient evidence supports

26

that determination by the jury, not whether another reasonable inference was unavailable as a matter of law. (See *People v. Mumin* (2023) 15 Cal.5th 176, 194-203 (*Mumin*) [holding that the proper standard of review for instruction on the concurrent intent (or "kill zone") theory is whether the evidence would support a *jury determination* that the only reasonable inference was that the defendant had the requisite intent, not whether the appellate court believes the only reasonable inference from the evidence is that the defendant had the requisite intent].)[11] Here, as we have explained, there was sufficient evidence for the jury to find no other reasonable inference than that defendant specifically intended to kill everyone within the zone of fatal harm. Therefore, the evidence was sufficient to support the kill zone instruction.

We are unpersuaded by defendant's contention that our Supreme Court's recent decision in *Mumin*, *supra*, 15 Cal.5th 176, compels a different result.[12] There, the high court found that a concurrent intent (i.e., kill zone) instruction was not supported by substantial evidence. (See *id*. at pp. 203-207.) However, the facts of *Mumin*, where the defendant fired three rounds from a nine-millimeter handgun in the direction of two officers positioned 25 feet apart behind two different closed doors in an open area, are clearly distinguishable. (See *id*. at pp. 188-189, 204-205.) As such, *Mumin* is of no assistance to defendant.

---

[11] In *Mumin*, the high court explained: "*Canizales* included the 'only reasonable inference' caveat to explain how the *jury* should evaluate circumstantial evidence relating to the defendant's intent. This discussion of the jury's role does not suggest a departure from the traditional substantial evidence standard in evaluating whether the *court* has properly instructed on a particular theory of conviction." (*Mumin, supra,* 15 Cal.5th at p. 201.)

[12] *Mumin* was decided by our Supreme Court while this appeal was pending. Thereafter, we granted defendant's request to file supplemental briefing and ordered the parties to submit letter briefs addressing the case.

B.  *CALCRIM No. 2670--Lawful Performance: Peace Officer*

Next, defendant argues the trial court committed reversible error by failing to instruct the jury pursuant to CALCRIM No. 2670.  He claims the omission of this instruction ensured that the jury would not be able to understand his defense--namely, that the officers were not engaged in the lawful performance of their duties "because at no time was [he] constitutionally arrested."  According to defendant, the trial court "violated its duty to instruct on the theory of the defense, and to provide the jury with every instruction necessary to comprehend an element of the offenses regarding the officers."  We see no reversible error.

1.  *Additional Background*

As an element of counts I through VI, which charged defendant with the attempted murder of a peace officer and assault upon a peace officer with a firearm, the prosecution was required to prove that each of the officers named in those counts was engaged in the lawful performance of their duties at the time of the offense.  (See CALCRIM Nos. 602, 860.)

During the jury instruction conference following the close of evidence, defense counsel asked the trial court to instruct the jury with CALCRIM No. 2670.  In support of his request, defense counsel indicated that he "plan[ned]" on arguing to the jury that defendant was unlawfully arrested due to a lack of probable cause and exigent circumstances.  In other words, defense counsel intended to urge the jury to find defendant not guilty on counts I through VI because the police officers were not engaged in the lawful performance of their duties.

The trial court denied defendant's request, finding that there was not substantial evidence to support the CALCRIM No. 2670 instruction.  After the jury returned guilty verdicts on counts I through VI, the court denied defendant's motion for a new trial based on the failure to instruct the jury with CALCRIM No. 2670.  In so ruling, the court explained that it was only required to give the instruction if it was supported by

28

substantial evidence, and that there was "no evidence other than the officers were doing their job properly."

### 2. *Applicable Legal Principles*

A "[d]efendant cannot be convicted of an offense against an officer engaged in the performance of official duties unless the officer was acting lawfully at the time." (*People v. Simons* (1996) 42 Cal.App.4th 1100, 1109.) "California cases hold that although the court, not the jury, usually decides whether police action was supported by legal cause, disputed facts bearing on the issue of legal cause must be submitted to the jury considering an engaged-in-duty element, since the lawfulness of the victim's conduct forms part of the corpus delicti of the offense." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217, superseded by statute on other grounds as stated in *In re Steele* (2004) 32 Cal.4th 682, 691.) "Disputed facts relating to the question whether the officer was acting lawfully are for the jury to determine when such an offense is charged." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1020.)

The bench notes for CALCRIM No. 602 and CALCRIM No. 860 each provide as follows: "On request, the court must instruct that the prosecution has the burden of proving the lawfulness of the arrest beyond a reasonable doubt. (*People v. Castain* (1981) 122 Cal.App.3d 138, 145. If lawful performance of a peace officer is an issue, give the . . . appropriate portions of CALCRIM No. 2670, Lawful Performance: Peace Officer." (Bench Notes to CALCRIM Nos. 602, 860 (Jan. 2007).)

CALCRIM No. 2670 instructs the jury that the People have the burden of proving beyond a reasonable doubt that a peace officer was lawfully performing his duties as a peace officer, and that, if the People have not met that burden, the jury must find defendant not guilty of all the offenses with lawful performance as an element. (CALCRIM No. 2670.) CALCRIM No. 2670 further instructs the jury that a peace officer is not lawfully performing his duties if he unlawfully arrests someone. (*Ibid.*) The portion of CALCRIM No. 2670 related to "[e]ntering a home without [a] warrant,"

states that, in order for an officer to enter a home to arrest someone without a warrant and without consent, there must be probable cause to believe a crime has been committed and exigent circumstances. (CALCRIM No. 2670, section B.) The bench notes to CALCRIM No. 2670 (citing *Wilkins, supra*, 14 Cal.App.4th at p. 777) state: "Give the bracketed section about entering a home without a warrant if the arrest took place in a home."

In *Wilkins*, two police officers were dispatched to a residence shortly after midnight in response to a report of a domestic dispute. (*Wilkins, supra*, 14 Cal.App.4th at p. 767.) Upon their arrival at the scene, the officers found the victim outside the residence. She was crying, her face and nose were red, and she told the officers her husband (the defendant) had hit her in the face a few times. (*Ibid.*) The victim asked the officers to go inside the residence to arrest the defendant. (*Ibid.*) When the defendant opened the door in response to knocking by the officers, the defendant was told that the officers needed to come inside and talk to him. (*Id*. at p. 768.) The defendant refused to allow more than one officer to enter. (*Ibid.*) When the defendant attempted to close the door, one of the officers blocked the door with his foot and hand, and forced the door open. (*Ibid.*) Thereafter, a struggle ensued inside the residence between the defendant and the officers that ended with the defendant's arrest. (*Ibid.*)

As relevant here, Wilkins's jury found him guilty of taking a peace officer's weapon while obstructing him (§ 148, subd. (b)) and resisting a peace officer (§ 69), both of which require as an element that the officer be engaged in the lawful performance of his duties at the time of the offense. (*Wilkins, supra*, 14 Cal.App.4th at pp. 767, 769.) On appeal, this court held that the trial court erred in failing to instruct the jury sua sponte on the exigent circumstances exception to the Fourth Amendment's warrant requirement in connection with "lawful performance of . . . duty" element of the offenses. (*Id*. at p. 776.) In so holding, we reasoned: "In order for the officers to have effected a lawful nonconsensual entry into the house to make a warrantless arrest, they must not only have

30

had reasonable cause to believe defendant had committed a felony but there must also have been exigent circumstances justifying the officers' immediate entry without obtaining a warrant. [Citation.] The instructional lacuna is not one which can be cured simply by clarification and amplification because the instructions given completely omit to address a material constituent of an element necessary for conviction." (*Id*. at p. 777.)

Further, in holding that the trial court had a duty sua sponte to instruct on exigent circumstances as a basis for lawful entry into Wilkins's house, this court explained: "Where, as here, there was no warrant, and, assuming there was no consent to enter, the arrest of defendant in his home was 'presumptively unreasonable.' [Citation.] . . . Thus, lawfulness of this felony arrest inside the home turns not only on reasonable cause [for the arrest,] but also on exigent circumstances and, because lawfulness of the arrest is an element of the offense charged, both issues [were required to be] submitted to the jury." (*Wilkins, supra*, 14 Cal.App.4th at p. 779, fn. omitted.)

In finding the instructional error harmless beyond a reasonable doubt, the *Wilkins* court explained that the evidence on exigent circumstances was substantial and it was not in conflict. (*Wilkins, supra*, 14 Cal.App.4th at pp. 779-780.)

### 3. *Analysis*

Even assuming the trial court erred in failing to instruct the jury with CALCRIM No. 2670, any error was harmless. For the reasons we stated in rejecting defendant's suppression argument, we are convinced beyond a reasonable doubt that defendant would not have obtained a more favorable outcome absent the asserted instructional error. (*Wilkins, supra*, 14 Cal.App.4th at p. 779 ["[i]nstructional error affecting an element of the offense warrants reversal unless we are able to conclude beyond a reasonable doubt that the jury's verdict was not affected by the error"].) The evidence adduced at trial supporting exigent circumstances and probable cause was uncontradicted and substantial. The *undisputed* evidence conclusively established that the officers were acting lawfully

31

when they initially seized defendant in his home and when they later detained him outside his home hours later following the shootout.

III

*Sufficiency of the Evidence*

Defendant argues substantial evidence does not support his convictions for attempted murder of a peace officer (Sergeant Stevens and Deputy Schlarb) and assault with a firearm upon a peace officer (Stevens, Schlarb, Deputy T. Seawell, and Deputy Green). He claims the evidence is insufficient to prove beyond a reasonable doubt that he "shot anything at the two officers." We disagree.

A. *Standard of Review*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) " 'We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) The testimony of a single witness is sufficient to support a conviction unless it is physically impossible or inherently improbable. (*People v. Brown* (2014) 59 Cal.4th 86, 106.) If the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Jennings* (2010) 50 Cal.4th 616, 639.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever

is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

"[T]o prevail on a sufficiency of the evidence argument, the defendant must present his case to us consistently with the substantial evidence standard of review. That is, the defendant must set forth in his opening brief *all* of the material evidence on the disputed elements of the crime in the light most favorable to the People, and then must persuade us that evidence cannot reasonably support the jury's verdict. [Citation.] If the defendant fails to present us with all the relevant evidence, or fails to present that evidence in the light most favorable to the People, then he cannot carry his burden of showing the evidence was insufficient because support for the jury's verdict may lie in the evidence he ignores." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.)

B. *Applicable Legal Principles*

To obtain a conviction for attempted murder, the prosecution must prove the defendant had a specific intent to kill and committed a direct but ineffectual act toward accomplishing the intended killing. (*Canizales*, *supra*, 7 Cal.5th at p. 602; see CALCRIM No. 600.)

To obtain a conviction for assault with a firearm upon a peace officer, the prosecution must prove: (1) the defendant did an act with a firearm that by its nature would directly and probably result in the application of force to a person; (2) the defendant did that act willfully; (3) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; (4) when the defendant acted, he had the present ability to apply force with a firearm to a person; (5) when the defendant acted, the person assaulted was lawfully performing his duties as a peace officer; (6) when the defendant acted, he knew, or reasonably should have known, that the person assaulted was a peace officer who was performing his duties; and (7) the defendant did not act in self-defense. (CALCRIM No. 860; see § 245, subd. (d)(1).) The People are

33

not required to prove that the defendant actually intended to use force against someone when he acted, and no one needs to actually have been injured by defendant's act. (See CALCRIM No. 860.)

Here, because defendant only challenges the sufficiency of the evidence to sustain the jury's finding that he fired gunshots at the officers, we limit our substantial evidence analysis to that issue.

C. *Analysis*

As an initial matter, we conclude defendant has forfeited his sufficiency of the evidence claims by failing to set forth all the relevant material evidence in the light most favorable to the prosecution. (See *People v. Battle* (2011) 198 Cal.App.4th 50, 62; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) But even were we to overlook forfeiture, defendant's claims fail on the merits.

We have independently reviewed the record and are convinced that substantial evidence supports the jury's determination that defendant fired gunshots at the officers. There is ample evidence in the record, as detailed *ante*, from which a rational jury could have concluded that defendant fired multiple gunshots from a 12-gauge shotgun in the direction of the officers named in counts one through six of the information. As we have explained, the evidence adduced at trial showed that Sergeant Stevens and Deputy Schlarb were positioned next to each other during the shootout, and that buckshot from defendant's shotgun blasts narrowly missed them. Stevens heard the "whizzing" of gunshots right over his head and Schlarb felt the rush of air from multiple gunshots close to his head. The evidence also showed that two other officers--Deputy Green and Deputy T. Seawell--were a few yards to the right of Stevens and Schlarb when the shotgun blasts were fired.

The fact that no buckshot was found in the area where Sergeant Stevens and Deputy Schlarb were positioned does not compel reversal for insufficient evidence, as defendant suggests. And, contrary to defendant's contention, there *was* "physical

34

evidence" supporting a finding that buckshot struck the tree next to Stevens. There was evidence that double-aught buckshot shells contain "nine fairly large lead balls," and that traces of lead were found on the tree. In addition, Schlarb testified that there were holes in the tree from a gunshot, and Stevens testified that he saw a pattern of buckshot in the tree. Photographs of the tree introduced at trial supported the officers' testimony. This is sufficient evidence under the applicable standard.

IV

*Firearm Enhancements*

Defendant asserts the matter must be remanded for resentencing to allow the trial court to consider whether to exercise its discretion to strike any of the firearm enhancements and impose a lesser, uncharged enhancement in its stead. Defendant claims that such relief is warranted because it is unclear from the record whether the trial court knew it had discretion to impose lesser firearm enhancements, as opposed to believing it only had the binary choice of imposing or striking the greater enhancements found true by the jury. The People respond that defendant forfeited this argument because he did not ask the trial court to impose lesser firearm enhancements at the sentencing hearing, and even if not forfeited, any error was harmless because it is clear the trial court would not have imposed lesser firearm enhancements. We agree with defendant that remand for resentencing is warranted.

A. *Additional Background*

As noted *ante*, the jury found defendant guilty on counts I through VI, which charged him with two counts of attempted murder of a peace officer and four counts of assault with a firearm upon a peace officer. The jury also found true the section 12022.53, subdivision (c) firearm enhancement allegations attached to these counts.

Prior to sentencing, defendant filed a sentencing brief requesting the trial court either strike the firearm enhancements or "substitute" lesser, uncharged firearm enhancements instead. In seeking the imposition of lesser firearm enhancements,

35

defendant relied on *People v. Morrison* (2019) 34 Cal.App.5th 217, which held that trial courts had the authority to do as he proposed (see *id*. at pp. 222-223.)

At the June 2021 sentencing hearing, the trial court indicated several times that it was aware of its discretion to strike the firearm enhancements and was choosing not to do so. In reaching its decision, the court explained that it considered defendant's background (e.g., age, criminal history), how the offenses were carried out, and other applicable "aggravating and mitigating facts." The court explained that defendant's repeated threats and unwavering "resolve" to harm any officer who attempted to enter his house was a "very important" factor in its decision not to strike the firearm enhancements. The court also noted that defendant had training in firearms, which are "designed to destroy," and found that his decision to fire up to four shotgun blasts at the officers (which required him to load a new shell for each gunshot) showed his intent to kill. The court explained that it would not strike the firearm enhancements because defendant was trained in firearms, understood that firearms are not "toys," and that firearms are used to "stop a threat," not to "warn people."

Defense counsel did not mention *Morrison* at the sentencing hearing or otherwise specifically ask the trial court to consider imposing lesser, uncharged firearm enhancements, as requested in his sentencing brief. And the court did not expressly state or otherwise indicate that it was aware of its discretion to impose lesser, uncharged firearm enhancements.

B. *Applicable Legal Principles*

Section 12022.53 establishes a three-tiered system for firearm enhancements: subdivision (b) provides for a 10-year enhancement for the personal use of a firearm; subdivision (c) provides for a 20-year enhancement for the personal and intentional discharge of a firearm; and subdivision (d) provides for a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death. (*People v. Tirado* (2022) 12 Cal.5th 688, 695 (*Tirado*).)

36

Effective January 1, 2018, Senate Bill No. 620 (2017-2018 Reg. Sess.) amended section 12022.53, subdivision (h) to give trial courts discretion to strike or dismiss an enhancement in the interest of justice. (*Tirado, supra*, 12 Cal.5th at p. 696.) However, prior to our Supreme Court's decision in *Tirado*, the Courts of Appeal were split on whether trial courts had the discretion to strike a firearm enhancement found true by the jury and impose a lesser, uncharged enhancement. (*Ibid.*)

In January 2022, our Supreme Court resolved this split. (*Tirado, supra*, 12 Cal.5th at p. 697.) The high court rejected the notion that trial courts are faced with a binary choice of either imposing or striking a section 12022.53 enhancement, and held that courts have discretion to impose an uncharged, lesser section 12022.53 enhancement where the facts supporting that enhancement were alleged and found true by the jury. (*Tirado*, at pp. 699-700.)

C. *Standard of Review*

We review a trial court's ruling on a motion to strike a firearm enhancement for abuse of discretion. (*People v. Pearson* (2019) 38 Cal.App.5th 112, 116.) In reviewing for abuse of discretion, we are guided by the principle that defendants are entitled to sentencing decisions made by a court exercising informed discretion. (*Tirado, supra*, 12 Cal.5th at p. 694.) "A court acting while unaware of the scope of its discretion is understood to have abused it." (*Ibid.*) "In such circumstances, . . . the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

D. *Analysis*

As an initial matter, we are not persuaded by the People's forfeiture argument. Although defendant failed to object when sentence was imposed on the firearm enhancements, we nevertheless conclude that defendant's claim is cognizable on appeal. At the time of sentencing, there was a conflict among the Courts of Appeal as to whether

37

trial courts had discretion to impose a lesser, uncharged firearm enhancement. (*Tirado, supra*, 12 Cal.5th at p. 696.) Further, the overwhelming majority of appellate courts that considered the issue had concluded that courts lacked authority to substitute a lesser enhancement. Under these circumstances, we find it appropriate to exercise our discretion to address the merits of defendant's claim. (*People v. Morrison, supra*, 34 Cal.App.5th at p. 224; *People v. Smith* (2003) 31 Cal.4th 1207, 1215.)

As for the merits, we conclude that defendant's sentence must be vacated and the matter remanded for resentencing. At the sentencing hearing, the trial court did not make any statements indicating that it was aware of its discretion to strike the firearm enhancements found true by the jury and impose lesser, uncharged firearm enhancements instead. Nor did it make any statements foreclosing the possibility that, had the court been aware of its discretion to substitute lesser firearm enhancements, it would not have done so. Accordingly, because the record does not clearly indicate the trial court would not have imposed lesser firearm enhancements, remand is appropriate. (*People v. Gutierrez, supra*, 58 Cal.4th at p. 1391.) To the extent the People argue otherwise, we are unpersuaded. (See *People v. Salazar* (Nov. 20, 2023, S275788) __ Cal.5th __ [2023 Cal. Lexis 6529 at p. *28] ["We emphasize that principle again: unless there is a clear indication from the sentencing court that it would be idle to do so, remand for resentencing is required. When the applicable law governing the defendant's sentence has substantively changed after sentencing, it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the scope of its discretionary powers at the time of sentencing. Mere reliance on the length of the original sentence and attendant decisions, such as imposing consecutive sentences, imposing middle or upper term sentences, or declining to strike enhancements, is not sufficient to provide a clear indication of what a sentencing court might do on remand if it had been fully aware of the scope of its discretionary powers"].)

In light of our decision to remand the matter for resentencing, we need not and do not consider defendant's remaining sentencing claims. At defendant's resentencing, he is entitled to the application of any new sentencing laws that may apply to him, as his conviction is not yet final.

V

*Pitchess Motions*

Defendant asks us to independently review the sealed record in connection with his *Pitchess* motion to compel disclosure of peace officer personnel records, and to determine whether the trial court abused its discretion in denying the motion. (*Pitchess v. Superior Court, supra*, 11 Cal.3d at pp. 535-540; *People v. Mooc, supra,* 26 Cal.4th at p. 1232.) Having done so, we find no abuse of discretion. (*People v. Hughes* (2002) 27 Cal.4th 287, 330.)

Defendant also asks us to independently review the sealed record in connection with his *Pitchess* motion to compel disclosure of records related to the blood draws taken from Sergeant Stevens and Deputy Green as part of the officer involved shooting investigation conducted by the Calaveras County Sheriff's Office, and to determine whether the trial court abused its discretion in denying the request. Having done so, we find no abuse of discretion. (*People v. Hughes*, *supra*, 27 Cal.4th at p. 330.)

## DISPOSITION

We vacate defendant's sentence and remand the matter for a full resentencing.  In all other respects, the judgment is affirmed.

_____/s/_____
Duarte, Acting P. J.

We concur:


_____/s/_____
Krause, J.


_____/s/_____
Boulware Eurie, J.